177 So.2d 33 (1965)
Marvin GRESHAM, W.E. Rion, J.N. Anderson, S.K. Lindsey, and Harry Edwards, as and comprising the Board of Trustees for the Alachua General Hospital, and Alachua County, a political subdivision of the State of Florida, Appellants,
v.
Clifford C. COURSON, as Administrator of the Estate of Dale Warren Courson, deceased, Appellee.
Marvin GRESHAM, W.E. Rion, J.N. Anderson, S.K. Lindsey, and Harry Edwards, as and comprising the Board of Trustees for the Alachua General Hospital, and Alachua County, a political subdivision of the State of Florida, Appellants,
v.
Clifford C. COURSON, Appellee.
Nos. G-54, G-55.
District Court of Appeal of Florida. First District.
June 15, 1965.
Rehearing Denied August 6, 1965.
*34 Gray, Chandler, O'Neal, Carlisle & Avera, Gainesville, for appellants.
Nichols, Gaither, Beckham, Colson & Spence, Miami, for appellee.
STURGIS, Chief Judge.
On March 1, 1963, Dale Warren Courson, the 11-month-old child of appellee Clifford C. Courson, plaintiff below, died in consequence of having been strangled on a cord around his neck from which was suspended a pacifier. The strangulation occurred in a day nursery maintained at the Alachua General Hospital in Gainesville, Florida, for the convenience of its employees, who paid a fee for the service. Two negligence actions were filed, consolidated for trial in the court below, and resulted in final judgments for plaintiff from which appeals were taken and are consolidated for the purpose of review.
In one case (our file No. G-54) the plaintiff (appellee), as administrator of the estate of his deceased child, was awarded a jury verdict for $25,000.00 damages against the members of the Board of Trustees for the Alachua General Hospital, in their relation as such, and also against Alachua County, a political subdivision of the State of Florida, defendants (appellants), based on a claim for damages to decedent's prospective estate and for his funeral expenses. A motion to vacate said judgment was denied but motion for a new trial was granted contingent upon a remittitur of $20,000.00, to which plaintiff consented.
By the other suit (our file No. G-55) plaintiff Courson, proceeding individually, sued said defendants under Section 768.03, Florida Statutes, F.S.A., for the wrongful death of his said child, claiming damages for the loss of the child's services during minority and for past and future mental pain and anguish of his surviving parents. In this action the jury returned a verdict of $100,000.00 for plaintiff and motions to vacate the judgment, for a remittitur, and *35 for a new trial were denied by an order in which the trial judge said:
"* * * it is the opinion of this Court that this case was very capably and fairly tried by counsel for both sides and the Court feels that the verdict rendered by the jury in this case was a result of careful and deliberate consideration by the jury of the factual disputes that existed as to the material issues in this cause, and it is the position of the Court that these matters were fairly determined by the jury * * *."
Defendant-appellants' points on appeal (1) challenge the sufficiency of the evidence to sustain the jury's finding of negligence on the part of the defendants, and (2) challenge the verdict of $100,000.00 in the father's action on the ground that it is excessive. We find no merit in the first contention. Our conclusion with respect to the second, however, impels a summary of the facts.
Mr. and Mrs. Courson were married in 1956. He has a Doctor's degree in education and is employed at the P.K. Yonge Laboratory School in Gainesville, Florida. His wife, a medical technician, was employed by the defendant hospital. Their first and only natural child, Dale, was not born until March 24, 1962. In November of 1957 Mrs. Courson, being concerned with her failure to conceive, consulted with a specialist in obstetrics to see what might be done to induce pregnancy; she thereafter had considerable medical treatment and study of her condition, and in April of 1959 underwent surgery to aid her in having children.
In the summer of 1961 the defendant hospital established a day nursery in which a fee was charged to care for children of its daytime employees. The children were divided into three age groups, generally referred to as "crib babies," "toddlers," and "older children." The crib babies were kept separate from the other children in a room equipped with seven baby cribs and a playpen. Normally the day nursery had five employees in all. On the day of the accident there were only four employees working in the nursery, two of whom, Mrs. Rhoda Mullis and Mrs. Betty Smith, were caring for the crib babies at the time the accident to plaintiff's child was discovered.
The events leading up to the accident were as follows:
Mrs. Courson, an employee of the hospital, first brought Dale to the day nursery on Monday, February 25, 1963, and continued to do so each day until his death on the following Friday, March 1. Each morning before leaving him at the nursery she placed a string around his neck with a pacifier attached thereto and it remained there each day until she picked him up after work in the evening. No one at the nursery informed her that the pacifier and string were dangerous and she did not consider them so. She did not instruct any of the nursery personnel to remove them. On February 27, Mrs. Mullis, the employee in charge of the nursery, wrote Mrs. Courson a note asking her not to visit the child during her lunch hour because it upset him.
On March 1 Mrs. Mullis completed feeding Dale at 11:50 a.m. and was preparing to put him in his crib when she was visited by the defendant's Director of Nursing Service, a Mrs. Morrison. About ten minutes later Mrs. Morrison left and Mrs. Mullis then called Mrs. Smith into the crib room, washed Dale's face, and put him down in his crib. When Mrs. Smith came into the crib room Mrs. Mullis took some soiled diapers out of the room and washed them, then checked on the other children in the nursery and about fifteen minutes later returned. At that time Mrs. Smith was changing a baby's clothes. Mrs. Mullis walked over to the crib adjoining Dale's where she picked up a child and took it to a counter in the room to feed it. At about that time a Mrs. Davis came into the crib room and asked Mrs. Smith to *36 see the Courson baby. Mrs. Mullis then heard Mrs. Davis inquire, "Is he choked?" and immediately looked around and saw Mrs. Smith with the Courson child in her arms. The child was forthwith taken to the emergency room of the hospital for treatment.
Mrs. Davis testified that she visited the nursery around the noon hour to check on her child; that when she went into the crib room Mrs. Smith and Mrs. Mullis were there, Mrs. Mullis preparing to feed a baby; that she asked Mrs. Smith where the Courson child was and seeing that it was lying on its stomach, walked around the crib to see its face, saw the string around its neck and noted that it was caught on a knob on a corner of the crib. She stated that it was only on close inspection when she bent over to see Dale's face that she saw the string and that she then assisted Mrs. Smith in taking the child to the emergency room.
Dr. Murphree, a practicing physician, testified that a few minutes before 12:30 p.m. on that day he observed a visual emergency signal and answered the call by going to the emergency room where he found Dale on the emergency room table; that Dale had no pulse or respiration and there were marks on the front half of his neck; that measures were taken which restored the heart beat and respiration and the child was eventually transferred to the University of Florida Medical Center where he died about 7:00 or 7:30 o'clock the next morning. Dr. Murphree testified that the mark on its neck was obviously from a string of some sort and the cause of death was lack of breathing for too long a period of time.
There was in effect on March 1, 1963, a regulation of the Child Care Center Board for Alachua County as follows:
"There shall be adequate and competent adult staff members to care for the children at all times, with a minimum of two adults, two adult members on duty at all times."
Dr. Edward G. Byrne, the Alachua County Health Officer, testified that in his opinion the nursery area where the children were kept should be under observation at all times and that one adult for eight infant crib children was an adequate ratio. On March 1, 1963, during the critical period involved, there were seven children in the crib room and either Mrs. Mullis or Mrs. Smith was physically present.
Subsequent efforts of Mr. and Mrs. Courson to have other children had proved unsuccessful; however, they adopted a male child (Christopher) who was 9 1/2 months of age at the date of the trial. Following Dale's death Mrs. Courson lost 22 pounds but had regained 8 pounds prior to the trial. Mr. Courson testified that following Dale's death his room at their home was kept locked for three or four months, that his wife was very nervous, easily upset, and cried easily, but that her mental and emotional condition improved after they adopted Christopher.
It is established that Mr. and Mrs. Courson were in a state of emotional shock after learning of Dale's accident and following his death were distraught; that Mrs. Courson required sedatives and tranquilizers in large dosages and could not rest; that they were competent parents and had a happy home. On the date of the trial Mrs. Courson was 33 years of age and Mr. Courson 31.
As hereinabove noted, we conclude that the evidence is sufficient to support the jury's verdict on the issue of liability. Where the exercise of ordinary care is required, negligence is commonly defined as the failure to do what a reasonable and prudent person would ordinarily have done under the circumstances, or the doing of what a reasonable and prudent person would not have done under the circumstances, resulting in injury to another. 23 Fla.Jur., p. 254. We are also mindful of the rule of foreseeability adopted by the Florida Supreme Court in Stark v. Holtzclaw (1925), 90 Fla. 207, 105 So. 330, 41 *37 A.L.R. 1323, quoting with approval from Atchison T. & S.F.R. Co. v. Calhoun, 213 U.S. 1, text 7, 9, 29 S.Ct. 321, 53 L.Ed. 671, as follows:
"* * * [o]ne is held responsible for all the consequences of his act which are natural and probable, and ought to have been foreseen by a reasonably prudent man."
* * * * * *
"But even where the highest degree of care is demanded, still the one from whom it is due is bound to guard only against those occurrences which can reasonably be anticipated by the utmost foresight. It has been well said that `if men went about to guard themselves against every risk to themselves or others which might by ingenious conjecture be conceived as possible, human affairs could not be carried on at all. The reasonable man, then, to whose ideal behavior we are to look as the standard of duty, will neither neglect what he can forecast as probable, nor waste his anxiety on events that are barely possible. He will order his precaution by the measure of what appears likely in the known course of things.' Pollock on Torts (8th ed.) 41."
The question of negligence involved on the trial of these cases was strictly a question of fact to be resolved by the jury and this court will not undertake to substitute its judgment for that of the jury, especially where supported by the trial court's denial of appellants' motion to set aside the verdict. What is and what is not negligence in a particular case is generally a question for the jury. Sprick v. North Shore Hospital, Incorporated, 121 So.2d 682 (Fla.App. 1960); Atkins v. Humes, 110 So.2d 663, 81 A.L.R.2d 590 (Fla. 1959).
With reference to the administrator's suit, in which appellee consented to a remittitur of $20,000.00, thus reducing the jury's award of $25,000.00 so as to limit the final judgment to $5,000.00, we hold that the reduced judgment, which is based on the claim of decedent's estate for the prospective value of the estate, together with damages for funeral expenses, is not so excessive as to warrant reversal or the imposition of an added remittitur. Appellants' second point of law involved presents a more vexatious problem.
With reference to appellee's claim under Section 768.03, Florida Statutes, F.S.A., appellants insist and we agree that the $100,000.00 verdict was not supported by the evidence and is so excessive as to compel the conclusion that the jury was influenced by passion, prejudice, bias, or some other improper motive.
There are two elements of damage recoverable under F.S. 768.03, F.S.A.: (1) the father's loss of the services of his child until the child would have become 21 years of age; (2) the value of the parents' mental pain and anguish occasioned by reason of the death of their child. In 1935, Mr. Justice Terrell, speaking for the Florida Supreme Court in Florida Dairies Co. v. Rogers, 119 Fla. 451, 161 So. 85, suggested that unless the deceased child had some extraordinary income-producing attributes, the cost of maintaining it to maturity would normally exceed the value of any services which might likely be rendered by the child to the parent. We are persuaded that a jury not unduly swayed by passion, prejudice, bias, or some other unlawful motive, would necessarily reach a similar conclusion; and a careful search reveals that the record herein is devoid of any evidence supporting the premise that the plaintiff parent would have reaped any monetary benefits from the services of the decedent had he lived. In the cited case, which involved the wrongful death of a 16-year-old son, Mr. Justice Terrell said:
"In cases where damages for mental pain and suffering are allowed, it must bear some reasonable relation to the facts, the status of the parties, the amount allowed as compensatory damages, *38 and the philosophy and general trend of decisions effecting such cases. When we say that the amount allowed must bear some reasonable relation to such factors, we do not mean that it must be equal to, be twice these, or bear any other arbitrary relation to them, but what we do mean is that these and other cognate factors are proper elements on which the allowance may be predicated. It cannot be predicated on the basis of restitution."
On rehearing granted in that case, the Supreme Court ordered a remittitur of $3,000.00 on a $10,000.00 verdict.
The general rule, as stated in 9 Florida Jurisprudence at page 518, is:
"* * * that the finding of the jury will not be set aside as excessive, except in extreme cases, as where it is the result of passion, prejudice, partiality, sympathy, undue influence, or other corrupt cause or motive, or where the court can clearly see that the jury has committed some palpable error or has totally mistaken the rules of law by which the damages, in the particular case, were to be measured. On the other hand, it is the plain duty of the court to see that the just limits are not exceeded, particularly where it is obvious that, in determining the amount of the verdict, the jury were not governed by the evidence or the proper charges of the court thereon, or by any reasonable estimates or computations, and the amount awarded is manifestly excessive."
As we have said, there is no evidence whatever upon which to predicate damages for loss of decedent's services, nor was any evidence presented as to the standard of living of decedent's family or the cost of maintaining decedent for the twenty years that would have elapsed if he had lived to attain majority. It is obvious, therefore, that the $100,000.00 verdict must primarily be related only to the past and future mental pain and suffering of Mr. and Mrs. Courson resulting from the wrongful death of their child. Construing the facts in the light most favorable to them, the record reveals:
When the accident to Dale was discovered Mrs. Courson was called to the emergency room of the hospital and Mr. Courson was called there from his work. They did not remain in the room where Dale was being treated but were kept in a waiting room and later sent home. However, they went to the University of Florida Health Center when Dale was transferred there, where they were seen by Dr. Carl Herbert, a gynecologist. He found Mr. and Mrs. Courson to be in a state of emotional shock, tremendously disturbed and upset. He saw them later at their home and attended the child's funeral with them. As heretofore noted, Mrs. Courson required heavy dosages of sedatives and tranquilizers to help get sleep and rest and she and Mr. Courson were both distraught. Three weeks later Mrs. Courson called on her gynecologist and expressed a desire to undergo any treatment that might help her to again become pregnant.
Mrs. Courson returned to work on March 25, 1963, some 24 days after Dale's death. The family pediatrician, Dr. Kokomoor, testified that although Mrs. Courson lost weight and appeared to be haggard after Dale's death, her condition improved almost immediately after adoption of the new baby and that she appeared to have returned to her normal self. There was no testimony that either Mr. or Mrs. Courson required any medication or medical treatment beyond the time of the funeral. The within summarized evidence concerning damages, as testified to solely by the plaintiff, his wife, and Dr. Herbert, is all that was presented to the jury. It was also confronted with argument of counsel for plaintiff to the effect that the case was worth $100,000.00 damages.
Appellants' brief asserts and appellee's brief does not refute that the only reported case in this jurisdiction involving the *39 wrongful death of a child of the age of plaintiff's deceased son is Thigpen v. City of Miami, 148 Fla. 304, 4 So.2d 365 (1941); City of Miami v. Thigpen, 151 Fla. 800, 11 So.2d 300 (1942), which was before the Florida Supreme Court on two occasions and in which the supreme court entered a remittitur of $2,000.00, reducing the judgment to the sum of $8,000.00.
Until quite recently the highest verdict approved by a court in this jurisdiction in an action by a father for the wrongful death of his child was $45,000.00. See Coast Cities Coaches Inc. v. Donat, 106 So.2d 593 (Fla.App. 1958). It is significant that the plaintiff father in Donat presented substantial evidence to the effect that his mental condition was altered and impaired as a result of the untimely and tragic loss of his 6-year-old child. In Holland Paving Co. v. Dann, 169 So.2d 849, decided November 24, 1964, our Third District Court of Appeal reversed an order granting a new trial in the father's suit as administrator of the estate of his deceased child in which the verdict of $10,000.00 was held by the trial court to be excessive, and affirmed a judgment of $50,000.00 in the companion suit of the plaintiff father, individually, for the wrongful death of his child. Said judgment appears to be the largest money judgment in a suit of such nature ever sustained by an appellate court of this jurisdiction. Certiorari to the Supreme Court of Florida was dismissed without opinion (February 1965), 173 So.2d 145.
We have affirmed the $5,000.00 judgment entered in the suit of the administrator (our file No. G-54), being constrained to do so only in the light of the remittitur imposed by the trial court the effect of which was to reduce from $25,000.00 to $5,000.00 the excessive verdict of the jury therein. The action of the trial court in ordering the $20,000.00 remittitur in that suit, which was consented to by the appellee, is to some extent persuasive, especially in the light of the hereinabove discussed verdicts of our appellate courts in similar cases, that the jury's verdict for $100,000.00 in the father's suit, individually (our file No. G-55), was induced by passion, prejudice, bias or some other improper motive. We are fortified in this conclusion by the fact, as appears by the record, that in each case here reviewed the jury verdict was in the exact amount suggested by counsel for plaintiff in the course of oral argument to the jury and does not appear elsewhere in the trial proceedings. A verdict is not per se excessive because the jury awards the full amount of damages suggested by counsel for the prevailing party, but we would be exceedingly naive should we fail to recognize that as a matter of practice the advocate usually suggests to the jury a figure for damages substantially in excess of the amount that is clearly supportable by the evidence and likewise in excess of the amount which he deems to be supportable in point of law should the jury happen to return a verdict approaching the amount suggested.
Persons who have suffered the heartaches and anxiety occasioned by the untimely death of a loved one know that there is no conceivable basis by which the appellee and his wife could be adequately compensated in money damages for their loss. Parenthetically, the appellate courts have been and always will be unable to devise a measure or scale by which to fix with mathematical certainty the minimum and maximum limits of the verdict which a jury may lawfully return in the suit of a surviving parent for the wrongful death of his child under the facts and circumstances peculiar to a particular case. In appeals testing the amount of the verdict and judgment there is no better criterion available than as stated by Mr. Justice Terrell in Florida Dairies Co. v. Rogers, supra, and it must of necessity be applied here. In that context, if the verdict and resulting judgment do not bear a reasonable relation to the philosophy and general trend of prior decisions in such cases, the judgment must either be set aside and a new trial awarded or a remittitur imposed reducing it to an amount which the appellate court in the *40 exercise of its discretionary powers and in good conscience deems sustainable. Faced with those alternatives, having in mind the philosophy and trend of the decisions in this jurisdiction, and having duly noted the amount of damages sustained by the appellate courts of Florida in like actions, it is the judgment of this court that the sum of $50,000.00 is the maximum amount of damages that the jury under the facts of this case was warranted in awarding to appellee, individually, in his suit under Section 768.03, Florida Statutes, F.S.A., for the wrongful death of Dale Warren Courson.
The judgment for plaintiff-appellee in the case identified by our file No. G-54 is affirmed. If the plaintiff-appellee in the case identified by our file No. G-55 will enter a remittitur for $50,000.00, the judgment in that case will be permitted to stand for the balance; otherwise it will be reversed for a new trial.
RAWLS, J., concurs.
WIGGINTON, J., concurs in part, dissents in part.
WIGGINTON, Judge (concurring in part, dissenting in part).
I concur in that part of the majority opinion which holds that the evidence in the record sustains the jury verdict in favor of plaintiffs on the issue of liability, and that the trial court was correct in denying appellants' motions for directed verdict and for a new trial on this issue.
I am unable to agree with that part of the majority opinion which holds that as a matter of law the verdict in favor of plaintiffs in the sum of $100,000.00 for pain and suffering and loss of services of their child is illegal and must be reversed unless they consent to a remittitur of $50,000.00.
In his order denying appellants' motion to set aside the verdict and for a new trial the trial judge held: "After hearing argument and the court being fully advised in the premises and having reviewed the record, it is the opinion of this court that this case was very capably and fairly tried by counsel for both sides and the court feels that the verdict rendered by the jury in this case was a result of careful and deliberate consideration by the jury of the factual disputes that existed as to the material issues in this cause, and it is the position of the court that these matters were fairly determined by the jury * * *."
It is established law of this state that the determination by a trial jury of the amount of damages to be awarded in a given case is entitled to great weight and should not be disturbed by an appellate court merely because the individual members of the court disagree with the amount awarded and prefer to substitute their judgment for that of the jury. This is particularly true when the jury's verdict has been approved by the judge who tried the case, heard the evidence and is in position to better judge whether the verdict is illegal and should be set aside.
The award by the jury to the plaintiffs in this case was for loss of services of their child which they could reasonably expect to receive prior to his maturity, and for the pain and suffering experienced by them as a result of his death.
With respect to the first element of damages, the majority opinion erroneously concludes that because plaintiffs failed to introduce any evidence supporting the premise that they would have reaped any monetary benefits from the services of the deceased child, that the jury was not justified in making any award on the claim based upon this element of damage. Such rule of law would withdraw from the jury its rightful function of determining the amount of damages, if any, which should be awarded on this type of claim, in the event no evidence is introduced from which the value of such services could be computed with mathematical certainty. Such a holding is *41 contrary to the rule followed by the Supreme Court of Florida in Winner v. Sharp,[1] when it said:
"In Miami Dairy Farms v. Tinsley, 115 Fla. 164, 155 So. 852, this Court held that recovery in a case like this should be reasonable recompense for parental pain and suffering, including fair compensation for services that might reasonably be expected the child would render the parents from the date of the accident to the date of its majority. Both elements of damages, while well recognized, are largely speculative and difficult of determination, but no one's estimate is better than a jury's."
From a review of the record before us I agree with the trial judge that this case was fairly and ably tried by counsel for both parties, and the damages awarded for pain and suffering of the parents is amply sustained by the evidence. Appellate courts are not at liberty to play a numbers game with verdicts rendered by juries in personal injury actions, especially when the verdict has been approved by the judge who tried the case. The majority opinion in this case cites former decisions of the Supreme Court and other courts where awards of damages resulting from pain and suffering of parents have been approved. From this review the majority has reached the arbitrary conclusion that because the verdict in this case exceeds verdicts in lesser amounts awarded in other cases, that the verdict here is illegal and must be stricken. Before such position may be taken in an appellate court, the record must disclose with reasonable certainty the event or events which infected the jury's consideration of the case and rendered its verdict illegal. Such has not been done in this case.
The rule of law applicable in situations of the kind here presented was stated by the Supreme Court in Braddock v. Seaboard Air Line Railroad Company[2] as follows:
"The rule does not seek to instruct the jury in the process by which they shall determine the amount of damages for pain and suffering. Jurors know the nature of pain, embarrassment and inconvenience, and they also know the nature of money. Their problem of equating the two to afford reasonable and just compensation calls for a high order of human judgment, and the law has provided no better yardstick for their guidance than their enlightened conscience. Their problem is not one of mathematical calculation but involves an exercise of their sound judgment of what is fair and right. * * *"
The decision rendered by the Supreme Court in the case of Little River Bank and Trust Company v. Magoffin[3] points with specificity to those factors which must clearly appear from the record on appeal before an appellate court will be justified in disturbing the verdict. In that case the court said:
"It has long been the settled rule in this jurisdiction that damages in a personal injury action are for the discretion of the jury. Unless `clearly arbitrary', Sproule v. Nelson, Fla. 1955, 81 So.2d 478, [76 A.L.R.2d 1066,] or `so excessive as to indicate that the jury was influenced by passion, prejudice, corruption, or other improper motive,' Upton v. Hutchison, Fla. 1950, 46 So.2d 20, 21, or `so much greater than it should have been so as to shock the judicial conscience,' Bartholf v. Baker, Fla. 1954, 71 So.2d 480, 484, *42 the amount awarded by the jury will not be disturbed on appeal. The burden is on the appellant to establish the fact that the verdict is wholly unsupported by the evidence or was the result of passion, prejudice or other improper motive. Bartholf v. Baker, supra."
In the recent case of Shaw v. Puleo[4] the Supreme Court reaffirmed its former decision in Radiant Oil Co. v. Herring[5] wherein it said:
"`It has been held that under the old common law rule, a motion for new trial for inadequacy of damages should not be granted but the general rule now seems to be that a verdict for grossly inadequate damages stands on the same ground as a verdict for excessive or extravagant damages and that a new trial may as readily be granted in the one case as the other. Such verdicts will not be set aside for the mere reason that they are less than the Court thinks they should be. It must be shown that the verdict was induced by prejudice or passion, some misconception of the law or the evidence or it must be shown that the jury did not consider all the elements of damage involved, missed a consideration of the issues submitted or failed to discharge their duty as given them by the Court's charge. 20 R.C.L. 283.'"
In recognition of the foregoing rules applicable to assaults upon verdicts on the ground of excessiveness or inadequacy, this Court, in Wise v. Jacksonville Gas Corporation,[6] held:
"Under the jury system which prevails in this state, great credence is placed in the verdict of a jury, whose exclusive function it is to weigh the evidence and fix the amount of damages, if any, to which the parties are entitled under the law as charged by the court. * * * If the verdict is so inordinate in amount as to shock the judicial conscience, or to indicate that the jury has been unduly influenced by passion or prejudice, then and only then may the court in the exercise of its discretion strike down the verdict and award a new trial. Absent such a circumstance, the amount of damages to be awarded rests solely within the sound discretion of the jury. * * *"
The majority opinion is eloquently silent as to anything appearing in the record on appeal which demonstrates with reasonable certainty that the amount of damages awarded was "clearly arbitrary," or "so excessive as to indicate that the jury was influenced by passion, prejudice, corruption, or other improper motive," or "so much greater than it should have been as to shock the judicial conscience."
A determination of the amount of money which should be awarded for pain and grief suffered and to be suffered by parents for the wrongful death of their child is admittedly a difficult task fraught with uncertainties and some degree of speculation. In addition to the pain suffered before trial by the parents of the deceased child in the case sub judice, their life expectancy is such that they may reasonably be expected to grieve and suffer with varying intensity for the next seventy-eight years of their combined life spans. I am in agreement with the statement by Justice Terrell in Winner v. Sharp, supra, when he wrote:
"* * * Those who have not brought a child into the world and loved it and planned for it, and then have it suddenly snatched away from them *43 and killed can hardly have an adequate idea of the mental pain and anguish that one undergoes from such a tragedy. No other affliction so tortures and wears down the physical and nervous system. Psychosomatic illness of a serious nature may follow. The emotions may be unstrung, the nerves put on edge and the end effect may be a period in a rest home, a mental hospital, serious physical derangement and sometimes death. Damage for mental pain and suffering is one of the late developments in the law and its potentialities are not restricted as they formerly were because so much has been learned of the evil consequences that flow from mental injury. * * *"[7]
The facts in this case fall squarely within the factual situation appearing in the case of Jacksonville Terminal Company v. Misak[8] insofar as concerns the validity of the jury's verdict awarding plaintiffs damages for pain and suffering. In that case the Supreme Court, speaking through Justice Thornal, said:
"* * * We are willing to concede that the amount awarded in the instant case appears to us as individuals to be high. However, at the judicial appellate level we are not in a position to conclude as a matter of law that the amount of this verdict is so shockingly excessive as to justify our intrusion on the jury function and require a new trial. In addition we must accord due respect to the judgment of an experienced trial judge who heard the case, considered the matter of excessiveness on the motion for new trial and declined to exercise his judicial discretion to disturb the verdict. Under all of these circumstances we cannot conclude that the amount of the verdict is so grossly excessive as to justify judicial interference."
For the foregoing reasons it is my judgment that appellants have failed to demonstrate that the verdict rendered in this case is illegal because of any of the factors recognized by law, and the trial court's order approving the verdict should be sustained.
NOTES
[1] Winner v. Sharp, (Fla. 1949) 43 So.2d 634.
[2] Braddock v. Seaboard Air Line Railroad Company, (Fla. 1955) 80 So.2d 662.
[3] Little River Bank and Trust Company v. Magoffin, etc. et al., (Fla. 1958) 100 So.2d 626.
[4] Shaw et al. v. Puleo, etc. et al. (Fla. 1964) 159 So.2d 641.
[5] Radiant Oil Co. v. Herring, 146 Fla. 154, 200 So. 376.
[6] Wise v. Jacksonville Gas Corporation, (Fla.App. 1957) 97 So.2d 704.
[7] Supra note 1, 43 So.2d at 636-637.
[8] Jacksonville Terminal Company v. Misak, (Fla. 1958) 102 So.2d 295.