RAWLS, Judge.
Appellant Railroad by appealing this wrongful death judgment in the sum of $80,000.00 rendered in favor of Appellee Gay submits two points for review, viz.:
1. The jury verdict and judgment is contrary to the manifest weight of the evidence and justice of the cause.
2. The verdict of the jury and the judgment entered thereon is so grossly excessive as to shock the judicial conscience of the court.
*239 Mrs. Jewell Larson Gay’s 12 year old daughter, while standing at a school bus stop located about 20 feet North of a railroad crossing, was killed when Appellant’s train collided with Defendant Webb’s car which then veered across the road and struck the child. This wrongful death action was instituted by Mrs. Gay against Webb and the Railroad. A jury verdict and judgment against both defendants for $80,000 was rendered.
Webb, who was familiar with the crossing and the school bus stop, saw a group of children congregated at the stop. He was driving slowly about 10 or 15 miles per hour and did not observe the train, a working extra, although it appears that the engineer was giving the usual four intermittent blasts of the horn and ringing the engine bell. Webb is not involved in this appeal.
Appellant’s first point will require an extensive review of the facts relating to negligence of the railroad company interpreted in the light most favorable to the Appellee. The trainmen testified that the train, as it approached the crossing, was traveling at a speed of 45 to 48 miles per hour, although mathematical calculations based upon speed and distance traveled by both the train and the automobile could have supported a finding by the jury of a higher rate of speed for the train. All parties agreed that the Webb automobile was traveling at a speed of 10 to 15 miles per hour. The engineer was sitting on the right side of the engine cab of a “long nose diesel” which restricted his vision to the right side of the 40 foot nose of the engine. Sitting on the left side of the engine cab were a brakeman and a fireman whose duty it was to guard the left side of the train because of the obstruction of the engineer’s vision. The fireman and the brakeman saw the Webb car approaching the track from the left when the car was about 50 feet and the train about 300 feet from the crossing. Both men told the engineer that a car was coming but neither gave the emergency signal to stop and neither pulled the emergency brake. The cab was so noisy one had to shout to be heard, and although the fireman thought the engineer nodded his head, actually the engineer did not hear either of the warnings relative to the approaching car. When the engineer saw the front of the car on the right side of the engine he applied the brakes — that being at the time of impact. Neither the fireman nor the brakeman at any time attempted to apply the emergency brake located on their side of the cab since they assumed that the Webb car would stop for the oncoming train or would safely clear the crossing. Also watching the approaching car from the cupola on top of the caboose about 300 feet to the rear of the engine was the conductor and a flagman. These trainmen originally assumed the car would stop, but they testified it never decreased speed. When the car passed the crossbuck sign located at a point 13 feet from the south rail, all those watching except the conductor assumed that the car would safely clear the crossing. The conductor whose duty was to guard the rear of the train hesitated a few seconds and then turned the brake valve and found that someone had already applied the brakes. Thus, the trainman with the poorest vision, the engineer, was the first to apply the brakes and this was done only at the time of impact, whereas four other trainmen with unobstructed vision failed to take any precautionary measures.
As stated above we are not concerned with the question of Webb’s negligence, but we are concerned with whether there is present in this record substantial evidence supporting the findings and conclusions of the jury.[1] Such evidence is found in this record. The uncontradicted testimony of the brakeman and fireman who occupied the seats on the left side of the cab and who had the duty to guard the left side of the train was to the effect *240 that they watched the Webb vehicle approach the crossing at a constant rate of speed during the time the train traveled its last 300 feet before the collision. Neither of them at any time became apprehensive that the car and train were going to collide. Neither applied the emergency brake which either could have done, and neither of them warned the engineer in a substantial manner to apply the brakes or reduce the speed of the train. Other eye witnesses testified that they were apprehensive that a collision between the train and car was imminent. On the issue of negligence of the defendant railroad company the evidence was conflicting, so it was the jury’s province to resolve the conflicts and to judge the weight of the evidence and the credibility of the witnesses. Refusal of the trial judge to reject the verdict on motion for new trial shows his approval of it as being supported by the proofs and not against the manifest weight of the evidence. Our examination of the record leads us to a like conclusion.[2]
Next Appellant argues that the verdict of the jury in the sum of $80,000.00 is so grossly excessive as to shock the judicial conscience of the- court. By this point Appellant emphasizes what he terms a highly inflammatory argument on the part of Ap-pellee’s attorney. The comments which Appellant considers particularly objectionable were made by Appellee’s counsel at the beginning of the closing argument, but Appellant did not object at the time and rebutted in full when “he came to bat.” Suffice it to say, the comments of Appel-lee’s counsel are not to be considered a model for ethical argument. However, when weighing same against the arguments permitted by our Supreme Court in Tyus v. Apalachicola, Northern Railroad Co.,[3] the most that we can observe is that the instant argument could not be construed to be so prejudicial as to require a reversal for new trial.
Finally, Appellant contends that an $80,000.00 verdict under the facts of this case is so grossly excessive as to shock the judicial conscience of this court and requires the setting aside of the verdict or the entering of a remittitur reducing same to a reasonable amount. Appellant then cites numerous Florida cases concerning damages for death of a minor child, pointing out that with the exception of the $100,000.00 ' judgment and verdict in Gresham v. Courson,[4] (which was later reduced by this court to $50,000.00), the instant verdict of $80,000.00 is the highest award ever made in the state courts of Florida for the death of a minor child. The late Judge Sturgis who authored the opinion in Gresham reviewed at length decisions of this jurisdiction concerning the size of verdicts rendered by juries in actions for the wrongful death of a minor child, and observed therein the elements of damages applicable to such actions. In the instant action we are confronted primarily with one element, the value of the mother’s mental pain and anguish occasioned by the death of her 12 year old child. It was recognized in the Gresham case that persons who have suffered the heartaches and anxieties occasioned by the untimely death of a loved one know that there is no conceivable basis by which the parents could be adequately compensated with money damages for their loss. It was noted in Gresham that the parents did not require any medication or medical treatment beyond the time of the funeral and had made a commendable recovery from the loss of their 11 month old child especially after adopting another child. In the case sub ju-dice there is considerable testimony as to the impairment of health suffered by Mrs. Gay due to the loss of her child. Mrs. *241 Gay’s family physician testified that her health was excellent prior to this tragedy, but that subsequent to same she has been hospitalized for a number of days, given sedatives and tranquilizers and that although she complained of low back pain, it was his feeling that it was anguish and anxiety over the loss of her child. Dr. Ekwall, an eminent psychiatrist, who conducted a physical and neurological examination of Mrs.-Gay testified:
“Well, with all the details I have gone into so far one can see that this last of the five children or the baby or the one with the most trouble delivering and the one she was very sick with during the pregnancy and went through surgery after the pregnancy, this was her last hope. A mother really invests a lot of herself into her children and especially into the baby of the family. This is common knowledge that the baby gets the mother’s deepest attention because this is her last offspring, so to speak, and this emotional investment is very important psychologically to mothers. Most people know you wouldn’t fool around much, with a mother’s baby. They hang onto them close. It is real important to the individual. We like to think of this investment that mother puts in them and the energy, it is like investing money in Blue Chip Stocks or in savings accounts in the bank. This is what a mother is going to give to society and give to posterity. Everything she puts into this one child. Then if anything happens to that child, then the bank goes bankrupt and you lose your savings and the company goes defunct and you lost your investment. That is why they have this prolonged neurotic depressive reaction and long grief reaction after such a loss. This is the one prime investment.”
We do not say that as a matter of law the pain and mental anguish suffered by a parent as the result of the loss of a 12 year old child is greater than that of an 11 month old child. However, it would be necessary to ignore the very basic nature of human experience not to give efficacy to the testimony of Dr. Ekwall as to the day to day investment of love and companionship that is made by a parent or parents during the formative years of a child’s life. What one child might be worth to one parent and another child to another parent is not mathematically computable, and it is for this reason that we must give wide discretion to the findings of six human beings impaneled as a jury. After completely reviewing the entire record of this case, our judicial conscience is not shocked, and the judgment and verdict are approved.
Affirmed. .
CARROLL, DONALD K., Acting C. J., and JOHNSON, J., concur.

. See Carolina Lumber Co. v. Daniel, 97 So.2d 156 (Ma.App.1st, 1957).

. Plaks v. Florida East Coast Ry. Co., 175 So.2d 216 (Fla.App.3d, 1965).

. Tyus v. Apalachicola Northern Railroad Co., 130 So.2d 580 (Fla.1961).

.Gresham v. Courson, 177 So.2d 33 (Fla. App.1st, 1965).