POLEN, J.
Philip Morris USA, Inc. (PM USA) appeals the final judgment, awarding appel-lee, Lucinda Naugle, $36,760,500, after finding PM USA liable for Naugle’s injuries caused by her addiction to PM USA-manufactured cigarettes. PM USA raises *1158 five issues on appeal. We reject each of appellant’s contentions of error and affirm the judgment in its entirety.
As an Engle[1] progeny case, the trial was conducted in two phases in the manner we approved of in R.J. Reynolds Tobacco Co. v. Brown, 70 So.3d 707 (Fla. 4th DCA 2011). The evidence presented in Phase I revealed that Naugle smoked PM USA-manufactured cigarettes from 1968 (age 20) until 1993. When she began smoking cigarettes, she had never heard of nicotine or its addictive nature. She became addicted and was eventually diagnosed with severe chronic obstructive pulmonary disease (COPD) with exacerbation. The Phase I jury found that Naugle was an Engle class member (i.e., she had been addicted to cigarettes containing nicotine and the addiction was a legal cause of her emphysema).
Phase II involved issues of causation, comparative fault, and damages. The trial court instructed the Phase II jury that based on the Phase I verdict, Naugle was entitled to the following Engle findings: (1) PM USA was negligent; (2) PM USA sold or supplied cigarettes that were defective; (3) PM USA placed cigarettes on the market that were defective and unreasonably dangerous; (4) PM USA concealed or omitted material information not otherwise known or available, concerning the health effects or addictive nature of smoking cigarettes; and (5) PM USA agreed with other tobacco companies to conceal or omit information concerning the health effects of cigarettes or their addictive nature with the intention that smokers and the public would rely on this information to their detriment.
After Phase II, the trial court instructed the jury on legal causation as to each of Naugle’s claims. The jury found PM USA ninety percent at fault and Naugle ten percent at fault and awarded compensatory damages in the following amounts: $90,000 for past medical expenses; $3.7 million for future medical expenses; $12.2 million for past pain and suffering; and $40.6 million for future pain and suffering. The jury further determined, by clear and convincing evidence, that punitive damages were warranted in the amount of $244 million.
The trial court granted PM USA’s post-verdict motion for remittitur and reduced the non-economic compensatory damages to $9,825,000, for a total compensatory damages award of $12,982,500, after applying comparative fault. The trial court also reduced the punitive damages award from $244,000,000 to $25,965,000, a 2:1 punitive-to-compensatory ratio. Naugle accepted the remitted amount of $38,947,500, and the trial court entered an amended final judgment in the amount of $36,760,500. PM USA now appeals the amended final judgment. For the reasons set forth below, we affirm on all points raised.
The trial court correctly applied Engle and correctly instructed the jury as to legal causation.
PM USA conceded at oral argument that our decision in Brown forecloses the first two issues raised in its brief — whether application of the Engle findings to this progeny case violates appellant’s due process rights and whether the trial court properly instructed the jury as to legal causation.[2]
*1159 The trial court properly denied PM USA’s motion for directed verdict as to the fraudulent concealment and conspiracy claims.
PM USA argues that Naugle did not prove reliance, and in any event, her claims are barred by the statute of repose. “[A] trial court should direct a verdict against the plaintiff only if there is no evidence, or reasonable inferences therefrom, upon which a jury may find for the nonmoving party.” NITV, L.L.C. v. Baker, 61 So.3d 1249, 1252 (Fla. 4th DCA 2011) (citation omitted). We review this issue de novo. Contreras v. U.S. Sec. Ins. Co., 927 So.2d 16, 20 (Fla. 4th DCA 2006).
Fraud can occur by omission, and one who undertakes to disclose material information has a duty to disclose that information fully. ZC Ins. Co. v. Brooks, 847 So.2d 547, 551 (Fla. 4th DCA 2003) (citing Gutter v. Wunker, 631 So.2d 1117, 1118-19 (Fla. 4th DCA 1994)). “[A] claim of fraudulent misrepresentation and/or concealment requires proof of detrimental reliance on a material misrepresentation.” Soler v. Secondary Holdings, Inc., 771 So.2d 62, 69 (Fla. 3d DCA 2000) (citing Johnson v. Davis, 480 So.2d 625, 627 (Fla.1985)). “If a plaintiff claims to be misled, but cannot demonstrate a causal connection between the defendant’s conduct and the plaintiffs misapprehension, the plaintiff cannot recover.” Humana, Inc. v. Castillo, 728 So.2d 261, 265 (Fla. 2d DCA 1999) (citation omitted). However,
[i]t is not necessary that a direct statement be made to the representee in order to give rise to the right to rely upon the statement, for it is immaterial whether it passes through a direct or circuitous channel in reaching him, provided it be made with the intent that it shall reach him and be acted on by the injured party.
Harrell v. Branson, 344 So.2d 604, 606 (Fla. 1st DCA 1977) (citation omitted).
Florida’s statute of repose requires that any action “founded upon fraud” be filed within twelve years “after the date of the commission of the alleged fraud, regardless of the date the fraud was or should have been discovered.” § 95.031(2)(a), Fla. Stat. (2007). Engle was filed on May 5, 1994; thus, any concealment claim in this case had to be based on conduct that occurred after May 5, 1982. Because fraudulent concealment requires proof of reliance, Naugle’s claim is barred unless the record demonstrates that she justifiably relied on statements or omissions made after that date. Joy v. Brown & Williamson Tobacco Corp., No. 96-2645CIV-T24(B), 1998 WL 35229355, *5 (M.D.Fla. May 8, 1998).
At trial, Naugle testified that by 1970, she was aware that smoking could be dangerous to her health. However, the Engle findings prove “that [PM USA] concealed or omitted material information not otherwise known or available knowing that the material was false or misleading or failed to disclose a material fact concerning the health effects or addictive nature of smoking cigarettes or both.” Engle, 945 So.2d at 1277; Brown, 70 So.3d at 710. Although Naugle was aware that smoking could have been dangerous to her health, the Engle findings preclusively establish that PM USA knew that smoking cigarettes presented dangerous health consequences and that it concealed material information relating to the true health effects of smoking as well as the addictive nature of smoking.
As the First District held in R.J. Reynolds Tobacco Co. v. Martin, 53 So.3d 1060 (Fla. 1st DCA 2010),[3] this concealed infor *1160 mation was designed to create doubt in the smoker as to all of the known health hazards created by smoking cigarettes. Moreover, the record in this case demonstrates that PM USA continued to conceal material information relating to the true health effects of smoking well after 1982.[4] We therefore hold that it was for the jury to determine (1) whether Naugle would have continued to smoke PM USA’s cigarettes if not for PM USA’s nondisclosures; and (2) whether Naugle justifiably relied on the false controversy created by the tobacco industry after May 5, 1982. The jury found for Naugle on these issues, and as the jury’s findings are supported by competent substantial record evidence, we do not disturb these findings on appeal.
The trial court did not err in denying PM USA’s motion for new trial based on the compensatory and punitive damages awards.
The trial court found that the non-economic and punitive damages were excessive pursuant to section 768.74(5), Florida Statutes:
I am [] convinced that the jury panel was conscientious, intelligent, and sincerely intent on doing justice. However, I must conclude that the jury was moved by passions — sympathy for [Naugle’s] suffering and anger toward PM USA’s conduct and strategy, resulting in the failure to follow my instructions that the damages awarded shall be based solely on PM USA’s conduct directed to this Plaintiff, and the harm caused to this Plaintiff.
The trial court granted PM USA’s motion for remittitur and denied its motion for new trial. PM USA argues that because the trial court expressly found that both the compensatory and punitive damages awards were infected by passion and prejudice, and that the jury disregarded the court’s instructions, likely including punishment for non-party harms in awarding punitive damages, the awards must be set aside because these errors cannot be cured by remittitur. Instead, PM USA argues a new trial is the proper remedy.
In reviewing a trial court’s grant or denial of a motion for new trial, this court applies an abuse of discretion standard. Philip Morris v. French, 897 So.2d 480, 490 (Fla. 3d DCA 2004). Orders of remittitur are likewise reviewed for an abuse of discretion. Adams v. Saavedra, 65 So.3d 1185, 1188 (Fla. 4th DCA 2011). In support, PM USA relies on Lassitter v. International Union of Operating Engineers, 349 So.2d 622 (Fla.1977), wherein the Florida Supreme Court stated: “In the absence of improper influences a remittitur may be appropriate, but here the District Court concluded that the verdicts were indicative of improper influences of passion and prejudice working on the jury.” Id. at 627. PM USA argues *1161 that this language demonstrates that re-mittitur cannot cure a jury’s disregard for its instructions. We find that this argument lacks merit for two reasons. First, PM USA’s argument is rebutted by the language of Florida’s remittitur statute:
In determining whether an award is excessive or inadequate ... the court shall consider the following criteria:
(a) Whether the amount awarded is indicative of prejudice, passion, or corruption on the part of the trier of fact;
(b) Whether it appears that the trier of fact ignored the evidence in reaching a verdict or misconceived the merits of the case relating to the amounts of damages recoverable;
(c) Whether the trier of fact took improper elements of damages into account or arrived at the amount of damages by speculation and conjecture. ...
§ 768.74(5)(a)-(c), Fla. Stat. (2010) (emphasis added). Based on the criteria set forth in section 768.74(5), “[i]f the court finds that the amount awarded is excessive or inadequate, it shall order a remittitur or additur, as the case may be.” § 768.74(2), Fla. Stat. (2010) (emphasis added). As the statute clearly states, passion, prejudice, corruption, ignoring the evidence, and consideration of improper elements of damages are all contemplated by the statute as reasons for remittitur.
Second, the “improper influences” in Lassitter consisted of newspaper articles discussing events leading up to the trial as well as the trial progress; heated exchanges during the trial; an admonishment by the trial judge of one attorney for calling a witness a liar; and a threat made by the trial judge to jail one of the attorneys. Lassitter, 349 So.2d at 627. We find Lassitter distinguishable on its facts.
PM USA also relies on Lindenfield v. Dorazio by Dorazio, 606 So.2d 1255 (Fla. 4th DCA 1992); however, Lindenfield does not support PM USA’s argument for a new trial. In Lindenfield, the trial court ordered an additur; however, because the appellants did not stipulate to the additur, the trial court granted the plaintiffs’ alternative motion for a new trial. Id. at 1257. Thus, in Lindenfield, the propriety of the trial court’s decision to grant an additur or remittitur was not at issue, as the additur was rejected by appellants, and a new trial was ordered. Although this court approved of the trial court’s order granting a new trial, it did not decide the issue of whether additur or a new trial was the more appropriate remedy. Instead, this court’s disagreement was only with the trial court’s decision to limit the new trial to the issue of damages. Id. at 1257 n. 1.
Additur/remittitur and a new trial are both appropriate remedies where a finding is made by the trial court that the jury was influenced by passion or prejudice:
A trial “court should not order a new trial unless it believes that the amount awarded is so great ‘as to indicate that the jury must have found it while under the influence of passion, prejudice or gross mistake.’ ” State Farm Mut. Auto. Ins. Co. v. Rindner, 996 So.2d 932, 934-35 (Fla. 4th DCA 2008) (quoting Glabman v. De La Cruz, 954 So.2d 60, 62 (Fla. 3d DCA 2007)). “ ‘Remittitur cannot be granted unless the amount of damages is so excessive that it shocks the judicial conscience and indicates that the jury has been influenced by passion or prejudice.’ ” City of Hollywood v. Hogan, 986 So.2d 634, 647 (Fla. 4th DCA 2008) (quoting Weinstein Design Group, Inc. v. Fielder, 884 So.2d 990, 1002 (Fla. 4th DCA 2004)).
Progressive Select Ins. Co. v. Lorenzo, 49 So.3d 272, 278 (Fla. 4th DCA 2010). Accordingly, having made such findings, the *1162 trial court did not abuse its discretion in granting appellant’s motion for remittitur and denying appellant’s motion for new trial.[5]
The non-economic damages award and the punitive damages award, as reduced by the trial court, are not excessive.
1. As reduced, the compensatory damages award is not excessive.
Even if not vacated altogether, PM USA argues that the non-economic pain and suffering award of $9,825,000, as reduced by the trial court, remains grossly excessive and must be reduced further.
Florida law requires that “awards of damages be subject to close scrutiny by the courts and that all such awards be adequate and not excessive.” § 768.74(3), Fla. Stat. (2010). “Under Florida law an award of non-economic damages must ‘bear a reasonable relation to the philosophy and general trend of prior decisions in such cases.’ ” Bravo v. United States, 532 F.3d 1154, 1162 (11th Cir.2008) (quoting Gresham v. Courson, 177 So.2d 33, 39-40 (Fla. 1st DCA 1965)). See also Davis v. United States, No. 08-81447-CIV, 2010 WL 2331094 at *9 (S.D.Fla. June 10, 2010) (“In reviewing the general trend of decisions in similar cases, the court should generally limit its inquiry to cases where pain and suffering awards were upheld against excessiveness challenges in similar scenarios, with a particular focus on cases drawn from the state appellate court having jurisdiction over the location where the tort in question occurred.”).
Non-economiq damages (e.g., mental pain and suffering) “are inherently difficult to measure.” R.J. Reynolds Tobacco Co. v. Townsend, 90 So.3d 307, 310-312 (Fla. 1st DCA 2012) (quoting Braddock v. Seaboard Air Line R.R., 80 So.2d 662, 668 (Fla.1955)). In Townsend, the First District affirmed a non-economic damages award of $10.8 million (before reduction for comparative fault) to the plaintiff, a personal representative of the estate of her deceased husband:
Although the $10.8 million compensatory damage award in this case is higher than the non-economic damage awards affirmed by this Court in the other En-gle progeny cases that we have reviewed to date, we cannot say that the award obviously exceeds the “reasonable range within which the jury may properly operate.” [Bould v. Touchette, 349 So.2d 1181, 1185 (Fla.1977) ].... We are persuaded from our review of the record *1163 that a proper evidentiary basis existed to justify the award and that, despite its size, it was not based merely on passion or prejudice.
Id. at 312 (footnotes omitted).
Although the First District determined that $10.8 million awarded by the jury was “certainly at the outer limit of reasonableness for a case such as this,” the court held that “the award is not so inordinately large that it shocks our collective judicial conscience.” Id. at 313 (citation omitted). Accordingly, the First District found “no abuse of discretion in the trial court’s refusal to second-guess the jury’s award of compensatory damages.” Id.
Here, Naugle presented testimony that her lungs are deteriorating, making it very hard for her to breathe. For example, she cannot walk to the car each morning; cannot drive; cannot do her own grocery shopping; and cannot stand in the shower or bend over to shave her own legs. Her treating physician testified that she has suffered from severe COPD with exacerbation since the 1990s and is now dependent on her oxygen tube twenty-four hours a day and will be for the rest of her life. He also testified that Naugle is experiencing muscle wasting.
A pulmonologist who has treated emphysema patients for thirty years, testified that Naugle has “severe lung disease” and that emphysema causes “the work of breathing” to cause “chronic pain” such as “generalized chest wall aching” and “fatigue [that] can be severe” and “extreme.” He further testified that emphysema affects Naugle’s ability to “get up and walk around and move around freely” and even creates difficulty for her to get in and out of a normal bed. He explained that “any cold will turn into a possible major disaster.”
Naugle’s sister-in-law testified that Nau-gle has been hospitalized two or three times and has been on oxygen, twenty-four hours a day, for several years. She explained that Naugle constantly has to sit down and take breaks while getting ready for work in the morning in order to regain her breathing capacity.
Thus, the jury received evidence of Nau-gle’s gradual deterioration over a period of fifteen years, which ultimately has led to her inability to breathe on her own without the assistance of a machine, “whose malfunction or loss of power would result in her demise.” The trial court noted that Naugle’s suffering was “clearly evident in the courtroom throughout the three weeks of trial,” and that “[t]he jury must also have concluded that [Naugle] was an independent woman who progressively became more and more incapable of functioning without the assistance of family and machine; each year enjoying life less and less.”
In reducing the non-economic damages award, the trial court assigned $10,000 damages for the years 1993 and 1994, increased that amount by $10,000 for the years of 1995 through 1999, further increased the amount by $15,000 each year from 2000 through 2005, further increased that amount by $25,000 each year from 2006 through 2008, and assigned $300,000 for 2009. Because the jury determined Naugle has a twenty-two year life expectancy, the trial court assigned $1,000 per day ($365,000 per year) for future damages.
It is important to note that the plaintiff in this case is the actual Engle class member rather than a personal representative. In this case, the verdict compensates Naugle for a period of approximately forty years (approximately seventeen years for past pain and suffering and twenty-two years for future pain and suffering). Therefore, the size of this verdict does not shock the conscience of this court. A verdict is not excessive just *1164 because it is large. Citrus Cnty. v. McQuillin, 840 So.2d 343, 347 (Fla. 5th DCA 2003) (citing Tobias v. Osorio, 681 So.2d 905, 907 (Fla. 4th DCA 1996)). Based on the First District’s decision in Townsend, the evidence presented to the trial court in this case, and the percentage by which the non-economic damages award was already reduced, we hold that the trial court did not abuse its discretion on remittitur. As reduced, the verdict is not excessive.

2. As reduced, the punitive damages award is not excessive.

Relying on numerous federal court decisions, PM USA contends that the $25,965,000 punitive damages award, as reduced by the trial court, remains excessive and requires further reduction because a 1:1 ratio is the constitutional maximum in cases involving six-or seven-figure compensatory damages awards. Pursuant to Florida law, an award of punitive damages may not exceed the greater of three times the amount of compensatory damages awarded. § 768.73(l)(a)l., Fla. Stat. (2010). However, where the fact finder determines that the wrongful conduct was motivated solely by unreasonable financial gain and determines that the unreasonably dangerous nature of the conduct, together with the high likelihood of injury resulting from the conduct, was actually known by the defendant, it may award an amount of punitive damages four times the amount of compensatory damages. § 768.73(l)(b)l., Fla. Stat. (2010). Nevertheless, section 768.73 does not prohibit an appellate court from determining the reasonableness of a punitive damages award that is less than three times the amount of compensatory damages. § 768.73(l)(d), Fla. Stat. (2010). Here, the remitted punitive damages award is twice the size of the compensatory award.
In Martin, the First District affirmed a punitive-to-compensatory damages ratio of 7.58 to 1:
We find the $25 million award here is not out of proportion with what the jury clearly considered to be wanton conduct by RJR in marketing a product it knew to be harmful and misleading the public about the health risks of smoking cigarettes. Neither does the award place RJR in a precarious financial position as the evidence showed that between 2005 and 2008 it had shareholder equity of approximately $8 billion and net annual earnings of $1 billion. We recognize, as RJR points out, there are thousands of Engle progeny cases pending in the trial courts and the company’s potential financial exposure is significant. But our review is limited to the facts and circumstances of this case, and we decline to disturb an otherwise reasonable punitive damages award to mitigate RJR’s future liability. Finally, the 7.58 to 1 ratio of punitive to compensatory damages does not, under the circumstances of this case, offend due process. Neither the United States Supreme Court nor the Florida Supreme Court has adopted a bright-line limit to which punitive damages awards must adhere.... There remain “no rigid benchmarks that a punitive damages award may not surpass,” but “[s]ingle-digit multipliers are more likely to comport with due process, while still achieving the State’s goals of deterrence and retribution, than awards with” higher ratios. State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 425, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003). We find no justification in the record to undo the jury’s decision to award Mrs. Martin $25 million in punitive damages.
Martin, 53 So.3d at 1072 (emphasis in original).
*1165 Accordingly, we hold that the ratio in this case, 2:1, is constitutional and not excessive in this ü7%gde-progeny case.

Affirmed.

TAYLOR and HAZOURI, JJ., concur.

. Engle v. Liggett Group, Inc., 945 So.2d 1246 (Fla.2006).

. Here, as in Brown, the trial court did not allow the jury to use the Phase I findings to determine legal causation, and thus liability, in Phase II. Instead, the jury was properly instructed on legal causation as to Naugle's claims in Phase II and was required to make causation findings on the Phase II verdict form. We find no error. See Brown, 70 So.3d at 715-18.

. The Martin court held that the record contained abundant evidence from which the jury could infer reliance on the false controversy created by the tobacco industry aimed at creating doubt among smokers that cigarettes *1160 were hazardous to health. Martin, 53 So.3d at 1069.

. Specifically, testimony, as well as PM USA’s own internal business records, revealed that PM USA publicly denounced the Surgeon General’s conclusion in 1988 that smoking was addictive, and PM USA did not admit that smoking was the cause of various diseases, including emphysema and lung cancer until October 2000, when PM USA altered its website to state that PM USA agrees with the opinions articulated by the Surgeon General. In addition, a video clip from 1994 was admitted into evidence, wherein PM USA executives, including PM USA’s CEO, testified before Congress that smoking was not proven to be harmful and nicotine was not addictive. At trial, Doctor Kenneth Cummings testified that in 1994, “there was no doubt” within the medical community that smoking was the cause of diseases like lung cancer and emphysema, and that such information "had been known for decades.” Dr. Cummings testified that "as early as 1958, [PM USA] scientists had indicated that cigarette smoking had been the cause of lung cancer.”

. On the Friday before the oral argument scheduled for the following Tuesday, PM USA filed a "notice of supplemental authority,” attaching the cases of Waste Management, Inc. v. Mora, 940 So.2d 1105 (Fla.2006), and Olivas v. Peterson, 969 So.2d 1138 (Fla. 4th DCA 2007), and arguing that pursuant to these cases, it was the "party adversely affected” by the trial court’s remittitur. In its initial brief, PM USA essentially argued that it was entitled to a new trial on damages because the jury was swayed by passion and prejudice. However, PM USA never argued in its initial brief that a new trial was required under section 768.74 because it was a "party adversely affected” by the remittitur. The argument based on section 768.74 is clearly a separate and distinct argument from the. one raised on appeal. As a result, this is not merely a case where the appellant made an argument on appeal, but failed to- cite relevant cases in support of its argument. Rather, the substance of the argument—that it was entitled to a new trial under section 768.74 as the party adversely affected by the remittitur—was never raised in the initial brief and was raised for the first time in the guise of a notice of supplemental authority. Thus, PM USA’s submission of "supplemental authority” did not supplement its arguments raised in its initial brief. Therefore, the issue is waived. See Hall v. State, 823 So.2d 757, 763 (Fla.2002) (citing J.A.B. Enters. v. Gibbons, 596 So.2d 1247, 1250 (Fla. 4th DCA 1992) ("[A]n issue not raised in an initial brief is deemed abandoned and may not be raised for the first time in a reply brief.”)).