[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 06-13052

_____

D. C. Docket No. 04-21807-CV-JAG

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
July 2, 2008
THOMAS K. KAHN
CLERK

RAIZA BRAVO,
OSCAR RODRIGUEZ,
individually and as co-personal representatives
of the Estate and Survivors of Kevin Bravo
Rodriguez,

Plaintiffs-Appellees,

versus

UNITED STATES OF AMERICA,

Defendant-Appellant,

KENNETH KUSHNER, MD.,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(July 2, 2008)**

Before CARNES and WILSON, Circuit Judges, and STAGG,[*] District Judge.

CARNES, Circuit Judge:

This is a tragic case in which the negligence of those acting for the United States government destroyed the life of a little boy and did much damage to the lives of his mother and father. The case is here not because anyone questions whether the government should pay, but because there are good faith disagreements about issues affecting how much it must pay.

**I.**

Raiza Bravo was entitled to care and treatment at the Naval Hospital in Jacksonville, Florida because her husband, Oscar Rodriguez, was a serviceman in the Navy. On June 10–11, 2003, Bravo was at the hospital for the birth of their child, Kevin Bravo Rodriguez. As a result of medical malpractice, Kevin was born with severe brain injuries. No one disputes that some of those whose negligence caused the injuries were full-time Naval personnel and therefore government employees for purposes of the Federal Tort Claims Act. There is a dispute about whether one doctor whose negligence contributed to the injuries is a government employee for FTCA purposes, and the resolution of that issue will

---

[*] Honorable Tom Stagg, United States District Judge for the Western District of Louisiana, sitting by designation.

determine what portion of the judgment the government is responsible for paying. There are also disputes about the size of the judgment.

One of the physicians who attended Bravo during the delivery was Dr. Kenneth Kushner, a civilian OB/GYN working at the Naval Hospital on a contractual basis. He is the negligent actor whose status as a government employee for FTCA purposes is in issue. A description of his status requires some explanation of the contractual context in which he worked.

The Department of Defense entered into a contract with Humana Military Healthcare Services, known as the "TRICARE Contract," through which Humana would provide medical services for eligible military personnel and their dependents. The contract allowed facilities like the Naval Hospital in Jacksonville to enter into their own agreements with Humana, known as "Resource Sharing Agreements" under which Humana (or its subcontractor) provides medical staff for the hospital. These contracts were subject to the terms of the original TRICARE Contract.

The Jacksonville Naval Hospital entered into a Resource Sharing Agreement with Humana, incorporating the hospital's own OB/GYN "Statement of Work" into the contract; that statement described with specificity the duties and responsibilities of the physician who was contracted to do OB/GYN work at the

3

hospital. Humana, in turn, sub-contracted with Sterling Medical Corporation to supply an OB/GYN physician to the Naval Hospital. Sterling contracted with Dr. Kushner for that purpose, and it was through that contract and Sterling's contract with Humana, as well as Humana's contract with the Naval Hospital, that Dr. Kushner came to the hospital as a civilian physician. The same "Statement of Work" included in the contract between Humana and the hospital was in turn incorporated into Dr. Kushner's contract with Sterling.

Following Kevin's birth, Dr. Kushner was subjected to peer review, temporarily suspended from the Naval Hospital, and instructed to take a course on fetal monitoring. Later, because of his negligence during Kevin's birth, the hospital permanently suspended Dr. Kushner's privileges with the result that he can no longer work there.

## II.

Bravo and Rodriguez filed suit against the government on their own behalf and on behalf of Kevin under the FTCA based on the personal injuries Kevin suffered and the loss of consortium with him that they each suffered. Bravo also claimed economic loss because of the time that she was required to spend caring for Kevin and her resulting loss of earning power. Bravo and Rodriguez claimed that Kevin was injured as a result of the wrongful acts and omissions of hospital

4

employees who were acting within the scope of their employment for the United States. They later amended the complaint to add a negligence count against Dr. Kushner individually.

Bravo and Rodriguez filed a motion for summary judgment asking the district court to find, as a matter of law, that Dr. Kushner was a government employee for FTCA purposes at the time he treated Bravo. Dr. Kushner filed a similar motion seeking the same result. Conversely, the government filed a cross-motion for summary judgment, asking the court to find as a matter of law that Dr. Kushner was an independent contractor and not a government employee. The district court denied the motions and set the case for trial.

After an eleven-day bench trial, the district court issued its findings of fact and conclusions of law. The court determined that the medical evidence indicated that everyone treating Bravo had failed to meet the requisite standard of care and that their negligence contributed substantially to Kevin's injuries. The government requested that the damages be apportioned under Fla. Stat. § 768.81(3) between the culpable Naval personnel (for which it admitted responsibility) and Dr. Kushner. The court declined to do that because it concluded that Dr. Kushner was himself a government employee for FTCA purposes. As a result there would be no basis for apportionment because the

5

government would be fully responsible for Dr. Kushner's part of the judgment. The court ruled that even if it were wrong about Dr. Kushner being a government employee, apportionment would still not be proper because of two exceptions to Fla. Stat. § 768.81(3): (1) the initial-subsequent tortfeasor exception, and (2) the indivisible injury exception.

The court entered a total judgment against the government in the amount of $60,485,788.98 to Bravo, Rodriguez, and Kevin. That judgment included: (1) $25 million in non-economic damages for Bravo; (2) $603,883 in economic damages for Bravo; (3) $15 million in non-economic damages for Rodriguez; (4) $10 million in non-economic damages for Kevin; and (5) $9,881,905.98 in economic damages for Kevin. At the time judgment was entered Kevin was almost two-and-a-half years old and had a life expectancy of twenty-one years. The damages were calculated based on the parental sacrifices and the surgeries, therapies, and medications that it was projected Kevin would need over the remaining eighteen-and-a-half years of his life as well as the suffering that would be endured during that time.

Dr. Kushner and the government both filed Rule 59 motions to alter or amend the judgment or, alternatively, for a new trial. The district court denied those motions, except that it did reduce the non-economic damages awarded to

Bravo and Rodriguez by $10 million each, so that Bravo received $15 million for her non-economic damages and Rodriguez received $5 million for his.  The court left the award to Kevin in place.  Those reductions  lowered the total judgment to $40,485,788.98.  The only explanation the court gave for reducing the awards, and the amount of the reductions, was that it was being done "[u]pon consideration of all relevant factors."  Even after the district court reduced the award, it was at that time the largest amount ever awarded to a single family for non-economic damages in the sixty-year history of the FTCA.[1]

The government filed its notice of appeal on May 22, 2006.  Kevin died, at the age of three, on August 21, 2006.

## III.

---

[1] The government asserted in its briefs that the award of $30,000,000 in non-economic damages in this case is the largest ever to a single family.  Bravo and Rodriguez did not disagree. While our own research suggests that assertion was true at the time the government made it, a recent award by a California district court is slightly higher.  In Gutierrez v. United States, No. 8:04-cv-01045-AHS-AN (C.D. Cal. Sept. 5, 2007), appeal filed, No. 07-56708 (9th Cir. Nov. 5, 2007), the court awarded a severely injured four-year-old child with a life expectancy of thirty-five years $31,000,000 in non-economic damages and also awarded the child's mother $750,000 in non-economic damages.  Gutierrez, No. 8:04-cv-01045-AHS-AN, slip op. at 9, 27, 38–39. The government has appealed the judgment in Gutierrez to the Ninth Circuit.  See Gutierrez v. United States, No. 07-56708 (9th Cir. Nov. 5, 2007).

Our dissenting colleague cites another large FTCA judgment from the Fifth Circuit, Dickerson ex rel. Dickerson v. United States, 280 F.3d 470 (5th Cir. 2002), and notes that the total award in that case, before it was reduced on appeal, was higher than the total award here. This observation is true, but irrelevant.  We are not concerned with the size of the total award in this case, but instead with the size of the non-economic damages portion of the award.

The government raises three primary issues on appeal, contending that the district court erred by: (1) finding that Dr. Kushner was a government employee instead of an independent contractor; (2) failing to apply Fla. Stat. § 768.81(3) to apportion the damages among the joint tortfeasors; and (3) not further reducing the damages awarded.

**A.**

There is some dispute among the circuits about whether an individual's status as a government employee in a given factual scenario is a question of law subject to de novo review or a question of fact subject to clear error review. See Duplan v. Harper, 188 F.3d 1195, 1200 (10th Cir. 1999) (holding that an individual's status as a government employee for the purpose of the FTCA is a question of law); Linkous v. United States, 142 F.3d 271, 275 (5th Cir. 1998) (same); but see Van Camp & Bennion v. United States, 251 F.3d 862, 865 (9th Cir. 2001) ("We review for clear error the question whether independent contractor status as opposed to employee status was correctly determined."). We need not take our place on one side or the other of the split because it does not matter in this case. Under either standard of review, we would leave the district court's determination of the government employee issue standing.

The district court stated that the question of Dr. Kushner's employment

status was "merely academic," because the court determined that either of two exceptions to Fla. Stat. § 768.81(3) applied, making all of the defendants jointly and severally liable for the entire damage award regardless of whether Dr. Kushner was an employee of the government. Alternatively, the court addressed the issue of Dr. Kushner's employment status, and interpreted the various contracts to mean that he was employed by the government for FTCA purposes. Because we agree with that alternative ruling we need not address the § 768.81(3) issues.

We have established the "control test" for determining whether an individual is a government employee or an independent contractor: "[A] person is an employee of the Government if the Government controls and supervises the day-to-day activities of the alleged tortfeasor during the relevant time." Patterson & Wilder Constr. Co. v. United States, 226 F.3d 1269, 1274 (11th Cir. 2000). Contrary to the government's argument, and what might be deduced from the language we have just quoted, the test does not require that the government exercise actual control over an individual. It is enough that the government has reserved the power or authority to control him. In Patterson, we put it this way: "[I]t is not necessary that the Government continually control all aspects of the individual's activities, so long as it has the authority to do so given the nature of

the task." Id.; see also Logue v. United States, 412 U.S. 521, 527–28, 93 S. Ct. 2215, 2219 (1973) ("[T]he critical factor in [determining if an individual is a government employee or an independent contractor] is the authority of the principal to control the detailed physical performance of the contractor." (emphasis added)).

The question of whether the Naval Hospital reserved the right to control Dr. Kushner's activities is one whose answer depends on the various contractual provisions. The Naval Hospital's own "Statement of Work" was incorporated into the Resource Sharing Agreement it had with Humana, and also into Dr. Kushner's contract with Sterling. The statement establishes that:

> The contractor OB/GYN [Dr. Kushner] physician activities shall be subject to day-to-day direction by Navy personnel in a manner comparable to the direction over Navy uniformed and civil service personnel engaged in comparable work. The term "direction" is defined as that process by which the OB/GYN physician receives technical guidance, direction and approval with regard to an element of work or a series of tasks within the requirements of this agreement.

What's more, the Resource Sharing Agreement between Humana and the hospital was also subject to the original TRICARE contract between Humana and the Department of Defense. The original TRICARE contract, as incorporated into the Resource Sharing Agreement, provided:

> [Humana] shall be responsible for monitoring the performance of

10

Resource Sharing personnel [Dr. Kushner] to ensure compliance with the terms and conditions of the Resource Sharing provider agreements. However, this <u>does not preclude Resource Sharing personnel [Dr. Kushner] from complying with directions received from [Navy hospital] professional personnel in the course of patient care activities</u>.

(emphasis added). Even though Humana, as the government contractor, retained the authority to enforce the terms of the agreement, the contractual language makes clear that the Naval Hospital reserved the right to direct Dr. Kushner "in the course of patient care activities." That TRICARE contract provision and the "Statement of Work" contained in the other contracts show that the government retained sufficient control over the day-to-day activities of Dr. Kushner to satisfy the <u>Patterson</u> control test.

The Resource Sharing Agreement does provide that "[t]he contractor [Humana] shall be solely liable for negligent acts or omissions of the contractor's agents [Sterling and Dr. Kushner] and shall ensure that providers maintain full professional liability insurance," but the allocation of insurance obligations is only one factor in determining an employee's status. See, e.g., <u>Duplan</u>, 188 F.3d at 1200. We look at the "totality" of the relationship, <u>Patterson</u>, 226 F.3d at 1276, and doing that, we agree with the district court that Dr. Kushner was a government employee for FTCA purposes.

11

Because Dr. Kushner was an employee of the government, we need not reach the government's argument that liability should have been apportioned among the separate tortfeasors in accordance with Fla. Stat. § 768.81(3). Regardless of the applicability of that statue, the government is liable for the entire judgment in its role as employer.

**B.**

Our review of the size of the damages verdict is for clear error. Ferrero v. United States, 603 F.2d 510, 512 (5th Cir. 1979).[2] "[T]he components and measure of damages in FTCA claims are taken from the law of the state where the tort occurred . . . ." Johnson v. United States, 780 F.2d 902, 907 (11th Cir. 1986) (quoting Harden v. United States, 688 F.2d 1025, 1029 (5th Cir. Unit B 1982)) (internal quotation marks omitted). Florida law dictates that a verdict cannot stand if it: (1) "is so extravagant that it shocks the judicial conscience," (2) "is manifestly unsupported by the evidence," or (3) "indicates the jury was influenced by passion, prejudice or other matters outside the record."[3] Citrus County v.

_____

[2] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

[3] Our dissenting colleague makes much of the fact that we have pointed to no evidence that the factfinder, in this case the district court judge, was "influenced by passion, prejudice or other matters outside the record," Citrus County v. McQuillin, 840 So. 2d 343, 347 (Fla. 5th DCA 2003), or that the award "is manifestly unsupported by the evidence," id. Dissenting op. at

12

McQuillin, 840 So. 2d 343, 347 (Fla. 5th DCA 2003); see also Krys v. Lufthansa German Airlines, 119 F.3d 1515, 1530 (11th Cir. 1997) (applying Florida law). Florida law is also clear that a "verdict must be set aside if it is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the trier of fact may properly operate." Johnson, 780 F.2d at 908.

In this case, the district court initially awarded a total of more than $60 million with $50 million of that being for non-economic damages. Bravo and Rodriguez were awarded $40 million ($25 million for Bravo and $15 million for Rodriguez) to compensate them for their non-economic suffering, while the child was awarded $10 million for that purpose. Without detailed explanation the court later reduced Bravo's and Rodriguez's non-economic damages awards by a total of $20 million, leaving them with $20 million ($15 million for Bravo and $5 million for Rodriguez).[4] The court left in place the child's non-economic damages award of $10 million. There was also an economic damages award to Bravo of

---

56. Our decision does not, and need not, rest on those bases. Instead, we confine our discussion to the first reason to set aside a verdict as excessive, that it "is so extravagant that it shocks the judicial conscience," McQuillin, 840 So. 2d at 347, and to the requirement under Florida law that an award of non-economic damages "bear a reasonable relation to the philosophy and general trend of prior decisions in such cases," Johnson, 780 F.2d at 907.

[4] The government filed a motion for new trial, or in the alternative, to amend the judgment. The district court entered an order denying that motion, except to the extent that it did reduce the award of non-economic damages to Bravo and Rodriguez by $10 million each.

13

approximately $10 million.

We recognize the deep and abiding tragedy of the loss Bravo and Rodriguez suffered. They are obviously entitled to recover a substantial amount to compensate them for their mental pain and suffering and for the loss of their child's companionship. Our task as an appellate court, however, is to decide the question of whether the award that Bravo and Rodriguez received is excessive. As the Third District Court of Appeal has explained, the excessiveness of an award is an issue that "will have to be determined in each individual case by the particular court upon the examination of a cold record without being subjected to prejudice and bias that may be occasioned in the emotionally charged atmosphere of a trial courtroom." Seaboard Coast Line R.R. Co. v. McKelvey, 259 So. 2d 777, 781 (Fla. 3d DCA), approved by 270 So. 2d 705 (Fla. 1972). Performing our task, we conclude that the award to Bravo and Rodriguez of $20 million in non-economic damages is excessive. It does "jar or shock the judicial conscience of an appellate court." Id. We reach this conclusion not by "plowing a new and rather circuitous route," Dissenting op. at 38, but by walking a well-worn and clearly marked path paved by the Florida court that would have reviewed this judgment if it had been rendered in a state court.

Our conclusion is bolstered by the fact that the $20 million to Bravo and

14

Rodriguez (to say nothing of the additional $10 million to the child) is one of the largest non-economic damages awards ever given anywhere in this country to a single family in the six-decade long history of the FTCA. It is grossly in excess of any non-economic damages award in any FTCA case applying Florida law in this circuit that we have been able to find. See, e.g., Dempsey ex rel. Dempsey v. United States, 32 F.3d 1490, 1497 (11th Cir. 1994) (affirming an award of "$1.3 million to [the deceased infant's] parents for the loss of [their child's] society and affection" (internal quotation marks omitted)); Johnson, 780 F.2d at 908 (vacating an award of $2 million, a portion of which was for mental pain and suffering, in a medical malpractice case involving the death of an infant because there was "nothing in the record before the district court to justify the amount of damages awarded," despite the fact that the parents testified at trial); Fairhurst v. United States, 2006 WL 2190553, at *4–5 (N.D. Fla. Aug. 1, 2006) (awarding $500,000 in non-economic damages to surviving spouse of elderly service member for her own pain and suffering and that of her husband in medical malpractice case); Turner v. United States, 2005 WL 2077297, at *9 (M.D. Fla. Aug. 26, 2005) (awarding $2.5 million in non-economic damages to a nine-year-old child who was blinded and suffered "brain damage and severe injuries" as a result of medical malpractice at a naval hospital; also awarding $750,000 in non-economic damages

15

to both of the child's parents), aff'd in part, rev'd in part, & vacated in part, 514 F.3d 1194 (11th Cir. 2008); Grayson v. United States, 748 F. Supp. 854, 863 (S.D. Fla. 1990) (awarding $2.95 million dollars in non-economic damages to a navy serviceman whose wife and two children were killed as a result of the Navy's failure to properly maintain a pier), aff'd in part, vacated in part, 953 F.2d 650 (11th Cir. 1992) (unpublished table decision); Williams v. United States, 681 F. Supp. 763, 765 (N.D. Fla. 1988) (awarding $900,000 each to parents who lost a young child and recognizing that the parents' pain and suffering was "real and intense and [would] remain a part of their lives for many years").

We find further support for our conclusion in the Florida appellate court decisions addressing whether other non-economic damage awards were excessive, which we will discuss in more detail later. Under Florida law an award of non-economic damages must "bear a reasonable relation to the philosophy and general trend of prior decisions in such cases." Johnson, 780 F.2d at 907 (quoting Gresham v. Courson, 177 So. 2d 33, 39–40 (Fla. 1st DCA 1965)) (applying Florida law); see also id. at 907–08 ("[I]t must bear some reasonable relation to . . . the philosophy and general trend of decisions effecting such cases." (quoting Fla. Dairies Co. v. Rogers, 161 So. 85, 88 (Fla. 1935))).

We first grappled with this standard in the Johnson case. There we vacated

16

a judgment of $2 million in an FTCA medical malpractice case because the district court had erred in excluding the testimony of a government expert witness. Johnson, 780 F.2d at 906. We also reached an alternative holding to support our decision. Id. That alternative holding counts because in this circuit additional or alternative holdings are not dicta, but instead are as binding as solitary holdings. Johnson v. DeSoto County Bd. of Comm'rs, 72 F.3d 1556, 1562 (11th Cir. 1996) ("[W]e are bound by alternative holdings."); McClellan v. Miss. Power & Light Co., 545 F.2d 919, 925 n.21 (5th Cir. 1977) (en banc) ("It has long been settled that all alternative rationales for a given result have precedential value. It does not make a reason given for a conclusion in a case obiter dictum, because it is only one of two reasons for the same conclusion." (internal quotation marks and citations omitted)); see also Massachusetts v. United States, 333 U.S. 611, 623, 68 S. Ct. 747, 754 (1948) (explaining that where a decision "rested as much upon the one determination as the other. . . . the adjudication is effective for both").

We held in Johnson that, even putting aside the evidentiary error, the judgment still was due to be reversed because the $2 million non-economic damages award was excessive. Johnson, 780 F.2d at 906. In articulating the standard for gauging excessiveness under Florida law, we noted that "Florida appellate courts rely heavily on the damages awarded by juries in similar cases,"

17

id. at 907, and we explained that:

> Although excessiveness may be tested by comparing the verdict to those damage awards determined not to be excessive in similar cases, we have been unable to find any reported case in Florida with an award this high. Perhaps some research or compilation of similar cases tried in Florida is available that could be submitted to the court and could be made a part of the record to furnish a basis for the amount that should ultimately be awarded.

Id. at 908 (citations omitted).

The parties disagree about what that passage from our Johnson opinion means. The crux of their disagreement is whether we should confine our review to published decisions of Florida appellate courts in gauging the philosophy and general trend of decisions in cases similar to this one. The government's position is that we should look only to reported appellate decisions applying Florida law that actually decide whether awards are excessive. Bravo and Rodriguez argue that we should also look to jury verdicts, trial court opinions, and reported appellate decisions that affirm judgments even when they do not address whether the award was excessive.

We acknowledge, as the dissenting opinion points out, that district courts and some appellate courts in Florida have interpreted Johnson as Bravo and Rodriguez argue we should. See, e.g., Grayson, 748 F. Supp. at 863 (considering

18

both jury verdicts and settlements in "ascertaining the trend of damage awards");[5]

Williams, 681 F. Supp. at 764–65 (purporting to apply Johnson and considering

jury verdicts and Florida appellate decisions to gauge the excessiveness of

non-economic damages award); McQuillin, 840 So. 2d at 347 & n.2 (reviewing

awards affirmed by another Florida appellate court, other states' appellate courts,

the Eleventh Circuit, and one federal district court, and concluding that an award

of non-economic damages totaling $4.4 million "although on the outer limit in

size, [was] not so excessive as to shock [the court's] composite judicial

consciences"); cf. Kammer v. Hurley, 765 So. 2d 975 (Fla. 4th DCA 2000)

(reversing the trial court's remittitur order after concluding that portions of the

---

[5] Our dissenting colleague notes that we affirmed the district court's judgment in Grayson. Dissenting op. at 2644. That affirmance gives no additional weight to the district court's opinion in that case. Our entire unpublished opinion in that case simply reads: "The judgment of the district court is AFFIRMED except the district court's award of interest from the date of the initial judgment as opposed to date of the affirmance is vacated." Grayson v. United States, 953 F.2d 650 (11th Cir. 1992) (unpublished table decision). Because our Grayson opinion is unpublished, it is not binding precedent. 11th Cir. R. 36-2.

In its opinion in Grayson the district court listed a number of verdicts and settlements that it considered in setting an award of non-economic damages for the loss of the Grayson's children. Grayson, 748 F. Supp. at 863–66. The court summarized those cases: "Four of the nineteen cases involve damages for the death of a child under ten years old. In these four cases, it appears that damages for a parent approximated $1 million for the wrongful death of a child." Id. at 863. The district court did not pick the highest judgment it could find but instead came up with a general amount or average. The resulting award was for $1.7 million in 1990 dollars ($850,000 for the death of each child). Id. Adjusted for inflation that award would be approximately $1,350,000 for each child in today's dollars. So, if we were to use the Grayson case as our touchstone, we certainly would vacate the $20 million non-economic damages award Bravo and Rodriguez received in this case.

19

non-economic damages awarded were not excessive when measured against other Florida appellate decisions, one of which did not address the issue of excessiveness).

Other courts, including other Florida appellate courts, in judging excessiveness have limited their consideration of other awards to those that have been challenged on appeal. See, e.g., Compania Dominicana de Aviacion v. Knapp, 251 So. 2d 18, 23 (Fla. 3d DCA 1971) (determining that a verdict which included non-economic damages in a wrongful death case was not excessive after comparing it to reported Florida appellate decisions and rejecting one party's reliance on "mere reports of trial verdicts" because such reports were "not binding as precedent" and were "factually distinguishable"); Smith v. Goodpasture, 179 So. 2d 240, 242 (Fla. 2d DCA 1965) (reversing an award for non-economic damages as excessive because it did not bear a "reasonable relation to . . . the philosophy and general trend of decisions affecting such cases" and citing only published Florida appellate decisions in determining the trend); Gresham, 177 So. 2d at 39–40 (reversing an award of non-economic damages as excessive after "duly not[ing] the amount of damages sustained by the appellate courts of Florida in like actions").

Presented with this variation among the state appellate courts as to the

proper approach, because we are bound to decide the issue the way the Florida courts would have, we look to the decisions of the Florida appellate court that would have had jurisdiction over an appeal in this case had it been filed in state court. See Farmer v. Travelers Indem. Co., 539 F.2d 562, 563 (5th Cir. 1976) ("A state action by this Lee County plaintiff would have been reviewed by the Second District [Court of Appeal]. Undoubtedly the trial court and the Second District would have followed the recent Second District opinion. Thus, the same law has been applied in federal court as would have been applied in the specific courts available to plaintiff in the state system."); see also Peoples Bank of Polk County v. Roberts, 779 F.2d 1544, 1546 (11th Cir. 1986) (following a particular District Court of Appeal decision because "it is the law that would have been applied in the specific courts available to plaintiff in the state system" (internal quotation marks omitted)). This case was filed in the Miami Division of the United States District Court for the Southern District of Florida. State courts located there are within the territory of, and are bound to follow decisions issued by, the Third District Court of Appeal.

Every decision we have found of the Third District Court of Appeal that looks to other judgments, thereby applying the general trend and philosophy approach to judging the excessiveness of non-economic damages awards,

21

considers only awards that have been challenged and upheld on appeal.  In

Metropolitan Dade County v. Dillon, 305 So. 2d 36 (Fla. 3d DCA 1974), the court

looked to  two reported Florida appellate decisions when it applied the "shocks the

conscience" standard and affirmed an award of $900,000 to parents of a six-year-

old child killed by a county garbage truck.  Dillon, 305 So. 2d at 40–41.  In

McKelvey, the court noted that it had been "pointed to a number of authorities

throughout [the] country on the amount of damages approved by appellate courts"

for similar injuries.  McKelvey, 259 So. 2d at 780.  Nevertheless, the court only

cited and relied on reported Florida appellate decisions to assess whether an award

of $399,000 for pain and suffering for the loss of an arm was excessive and

concluded that it was not.  Id. at 780–81.  In Knapp, the court determined that a

verdict which included non-economic damages in a wrongful death case was not

excessive, but it did so only after comparing it to reported Florida appellate

decisions.  Knapp, 251 So. 2d at 23.  In the course of doing that, the court refused

to consider "numerous million dollar jury verdicts" in part because "[m]any are

mere reports of trial verdicts which are not binding as precedent."  Id.  None of

those Third District Court of Appeal decisions measuring the philosophy and trend

of judgments in Florida looked to judgments that had not been size-tested on

22

appeal.[6]

Our dissenting colleague points out that in <u>Loftin v. Wilson</u>, 67 So. 2d 185 (Fla. 1953), a decision we cited in <u>Johnson</u>, the Florida Supreme Court relied not only on Florida appellate decisions but also on trial and appellate opinions from outside of Florida to gauge the excessiveness of a non-economic damages award. <u>Loftin</u>, 67 So. 2d at 189–90.  If we were operating in a decisional vacuum, <u>Loftin</u> might affect our analysis, but the atmosphere we are working in includes later Third District Court of Appeal decisions, one of which the Florida Supreme Court

---

[6] The dissent cites <u>Sta-Rite Industries., Inc.v. Levey</u>, 909 So. 2d 901 (Fla. 3d DCA 2004), as an example of a Third District Court of Appeal decision considering a trial court opinion from another state to determine whether a damages award was excessive.  In <u>Levey</u> the Third District Court of Appeal reversed a judgment of $104,409,053.20, some unknown portion of which was for non-economic damages.  <u>Id.</u> at 903, 909.  The court did so because it concluded that the award was based on "equivocal and uncertain testimony," was "shockingly excessive," and was "contrary to the manifest weight of the evidence."  <u>Id.</u> at 909.  In one of the string citations that follows those conclusions, the court cited a decision of the Northern District of New York, <u>Slade v. Whitco Corp.</u>, 811 F. Supp. 71 (N.D.N.Y. 1993).  <u>Levey</u>, 909 So. 2d at 909.

The <u>Levey</u> court did not compare the damages award before it to <u>Slade</u>, or to any of the Florida decisions contained in the string citations.  <u>Id.</u>  The string citations in <u>Levey</u> look nothing like the fact and amount-driven comparisons present in <u>Knapp</u>, <u>McKelvey</u>, and <u>Dillon</u>.  Compare id., with <u>Knapp</u>, 251 So. 2d at 23, <u>McKelvey</u>, 259 So. 2d at 780–81, <u>and</u> <u>Dillon</u>, 305 So. 2d at 40. Instead, it seems clear that the court cited <u>Slade</u>, and other cases, for the straightforward proposition that a damages award "not based upon sufficient credible evidence" cannot be sustained.  <u>Slade</u>, 811 F. Supp. at 76.  Our interpretation of <u>Levey</u> is bolstered by the fact that the <u>Slade</u> court left in place the jury's non-economic damages award but ordered a remittitur of the economic damages award, which it concluded was not supported by the evidence but instead speculative testimony about the injured person's life expectancy.  <u>Slade</u>, 811 F. Supp. at 77–78. The Third District Court of Appeal in <u>Levey</u> was faced with similarly "uncertain testimony" about the injured person's life expectancy.  <u>Levey</u>, 909 So. 2d at 909.  We therefore read <u>Levey</u> not as a retreat from the approach set forth in <u>Knapp</u>, <u>McKelvey</u>, and <u>Dillon</u>, but as a nod to persuasive authority from another jurisdiction on a relevant point of law.

23

affirmed.  See Seaboard Coast Line R.R. Co. v. McKelvey, 270 So. 2d 705,

706–07 (Fla. 1972).  Because we are bound to apply the specific law that would

govern if this case were brought in state court, which in this case would be the

Third District Court of Appeal's approach to size-testing non-economic damages

awards against only published Florida appellate decisions, an approach the Florida

Supreme Court has affirmed, Loftin does not dictate that we decide this case

differently.[7]

There is also the fact that our Johnson opinion speaks of  "reported" cases

and uses the descriptive phrase "damage awards determined not to be excessive in

similar cases," language which most aptly describes awards reviewed for

---

[7] We disagree with the dissenting opinion's characterization of the relationship between
Loftin and McKelvey.  While it is true that the Florida District Courts of Appeal may not
overrule a decision of the Florida Supreme Court, that is not what we have here.  Even though
the Florida Supreme Court did not discuss the Third District Court of Appeal's approach to
selecting comparator cases in its decision affirming McKelvey, it did affirm McKelvey, which is
good enough for our purposes.  Moreover, in McKelvey the Third District Court of Appeal cited
Loftin.  See McKelvey, 259 So. 2d at 781.  It gave no hint of any conflict between its decision
and Loftin.  We will not second-guess the relevant Florida appellate court's read of this state law
issue, especially since the Third District Court of Appeal has used the approach we take to
settling this issue both before and after McKelvey.

We also disagree with our dissenting colleague's suggestion that we should infer from
McKelvey that "the comparative analysis is not confined solely to published Florida decisions."
Dissenting op. at 44 n.3.  McKelvey cited no decisions from outside of Florida.  That the parties
to the case "pointed to a number of authorities throughout [the] country on the amount of
damages approved by appellate courts" for similar injuries, McKelvey, 259 So. 2d at 780, does
not mean that the court adopted that approach.  If the court had relied on decisions from outside
of Florida to gauge excessiveness, it would have told us so by citing those decisions.  The fact
that it did not do so is telling.

24

excessiveness on appeal. In <u>Johnson</u> we relied on <u>Gresham v. Courson</u>, 177 So. 2d 33 (Fla. 1st DCA 1965), when articulating the rule that we look only to reported Florida appellate decisions to measure excessiveness. <u>Johnson</u>, 780 F.2d at 907–08. The First District Court of Appeal in <u>Gresham</u> looked only to reported decisions of Florida's appellate courts to guide its determination of whether an award for pain and suffering in an action for the wrongful death of a child bore a "reasonable relation to the philosophy and general trend of prior decisions in such cases." <u>Gresham</u>, 177 So. 2d at 39. After reviewing the "only reported case in [Florida] involving the wrongful death of the child of the age" of the plaintiff's child, and after noting "the amount of damages sustained by the appellate courts of Florida in like actions," the court reduced the award accordingly. <u>Id.</u> at 38–40.

This interpretation of <u>Johnson</u> makes sense. The restriction of our consideration to reported appellate decisions in which awards were tested for size assures that we assess the "philosophy and general trend of prior decisions in such cases" on a statewide basis, not on the basis of varied trial court decisions. Focusing on awards that are appealed is also essential to ensuring that the measure is not skewed by phantom awards. There are a number of reasons that a verdict or award entered at the trial stage may not realistically reflect what is actually going on in the world of damage awards. Sometimes the limits of the defendant's assets

or of its insurance policy make most of an award meaningless and remove any incentive for testing its size on appeal. Other times there will be a high-low agreement that renders much of an award academic. Still other times the parties will settle after the verdict or award is announced for a more realistic amount which is not disclosed. In each of those situations, phantom awards that might well have been set aside as excessive on appeal, or even in further proceedings at the trial stage, are left to haunt the judgment books.

To take just one example, consider a case in which a jury returns a verdict for $100 million in non-economic damages. News of that huge verdict will, of course, be heralded in the usual bulletins and newsletters. The attorneys for both sides will recognize that an award of that size has no chance of being upheld on appeal. Suppose as well that it goes about $98 million beyond the assets and insurance of the defendant anyway. The two sides will do what we encourage them to do, which is to negotiate a more realistic figure between one and two million dollars. Settlements like that one are often kept confidential, and the news of the $100 million award cannot be recalled. Under Bravo and Rodriguez's view the ghost of that other-worldly award would establish that anything less than $100

million is not excessive. It cannot be.[8]

At oral argument the parents' counsel relied heavily on Eagleman v. Korzeniowski, 924 So. 2d 855 (Fla. 4th DCA 2006). The facts of that case are similar to those in this case, and there was a large award of non-economic damages: $7 million to each parent and $17 million to the child. Id. at 858. The damages award, however, was not appropriately appealed in the Eagleman case. In fact, the defendant's counsel failed to properly preserve any issues for appeal and the point of the Florida appellate court's opinion was "to remind trial counsel of the necessity of a proper objection to preserve issues for appellate review." Id. at 856–57. The court determined that none of the issues raised on appeal were properly before it and dismissed the appeal. Id. at 856. Because the damages award was not put into issue and was not addressed by the Eagleman decision, it does not assist us in assessing Florida's "philosophy and general trend" regarding non-economic damages. (Even if the issue of excessiveness had been raised and

---

[8] This is not a farfetched example. One of the judgments that Bravo and Rodriguez relied on in the district court and before us awarded a total of $46.5 million in non-economic damages. See Appellee's Br. Ex. A (citing Navarro v. Austin, No. 02–6154 (Fla. Cir. Ct. Sept. 29, 2006)). The public docket in that case indicates that sometime after the notice of appeal was filed the parties filed a joint motion to dismiss, which was granted, and thereafter there is an entry stating: "Approval of Global Mediated Settlement Granted." We do not know the settlement amount or how much of it was for non-economic damages, yet Bravo and Rodriguez would have us count the huge pre-settlement award in Navarro in their favor. That we will not do.

27

the award affirmed, the $14 million awarded to the parents in <u>Eagleman</u> would still be less than the total award to the parents in this case.)

Bravo and Rodriguez have also brought to our attention two other large jury verdicts. <u>See</u> <u>Hinton v. 2331 Adams St. Corp.</u>, No. 01-12933 (Fla. Cir. Ct. Jan. 30, 2003) (awarding $45 million in non-economic damages); <u>Navarro v. Austin</u>, No. 02-6154 (Fla. Cir. Ct. Sept. 29, 2006) (awarding $46.5 million in non-economic damages). We know nothing about the facts of those two cases. We do not know what happened to the awards after they were entered. We do not know whether they were later set aside by the trial court, or if there was a post-award settlement for a substantially lower amount. We do know that there was a post-judgment settlement in <u>Navarro</u>, but the details of it are unknown. <u>See</u> <u>supra</u> at 27 n.8. We also know that there is no appellate decision sustaining against an excessiveness challenge the award in either of those two cases.

Cases resulting in recent appellate decisions actually addressing whether a given damage award is excessive are far more helpful, and there are some of those. <u>See, e.g.</u>, <u>Glabman v. De La Cruz</u>, 954 So. 2d 60, 62–63 (Fla. 3d DCA 2007) (per curiam) (reversing as excessive the award of $8 million in non-economic damages to the parents of a teenage girl who died as a result of medical malpractice, reasoning that it was so large it could only have been the product of passion and

emotion); <u>Citrus County v. McQuillin</u>, 840 So. 2d 343, 347 (Fla. 5th DCA 2003) (holding that a $4.4 million verdict in non-economic damages to the seven-year-old son of a woman who was killed in a car accident, while "<u>on the outer limit in size</u>," was not so excessive as to require reduction (emphasis added)); <u>Kammer v. Hurley</u>, 765 So. 2d 975, 978 (Fla. 4th DCA 2000) (holding that a $2.5 million award to each parent for mental pain and anguish was not excessive where doctor negligently crushed the skull of the child just before birth, causing a stillborn delivery); <u>see also</u> <u>Walt Disney World Co. v. Goode</u>, 501 So. 2d 622, 626 (Fla. 5th DCA 1986) (holding that award of $1 million for past and future pain and suffering to each parent of a child who drowned on amusement park premises was not excessive).

Those decisions establish, among other things, that a total award of $5 million in non-economic damages to both parents of a child killed by medical malpractice was not excessive in 2000, <u>Kammer</u>, 765 So. 2d at 977–78, and that a $4.4 million non-economic damages award in 2003 also was not excessive, although the Florida appellate court noted that it did push the outer limits of permissible size, <u>McQuillin</u>, 840 So. 2d at 347. Those decisions also establish that in 2003 a total award of $8 million in non-economic damages to parents for the loss of a child through medical malpractice was so excessive that it could only

29

have been the product of passion and emotion. Glabman, 954 So. 2d at 62–63.

The most favorable decision for Bravo and Rodriguez is General Motors Corp. v. McGee, 837 So. 2d 1010 (Fla. 4th DCA 2002). In that case the parents watched as their son was trapped in a burning car. McGee, 837 So. 2d at 1015. He finally escaped but died later. Id. at 1016. Before the child died, he suffered burns over 98 percent of his body, but he could not even cry out because his vocal cords were "scorched." Id. The emergency room staff had to cut off his skin to relieve the pressure on his chest. Id. The physician who supervised the boy's care in the last few hours of his life described his injuries as the worst he had seen in a surviving burn victim. Id. The boy's father recounted seeing the boy suffer after the accident, recalling that "[h]e was black, he was just burned. I didn't see any hair, I didn't see any ears. I could see his braces; he had wor[n] braces." Id. at 1016 n.4. Both parents were also severely burned in the accident, as was their daughter. Id. at 1016. The mother's and daughter's burns were so severe that they each had to be immersed in a stainless steel tub of antiseptic to have their blisters scrubbed off every day. Id. The parents were not only suffering terribly from their own wounds and grieving over the loss of their son, but they also had to endure their daughter's screams as she had her burn blisters scraped and treated twice daily. Id.

30

The Fourth District Court of Appeal affirmed a total judgment of $60 million against General Motors in the McGee case. Id. at 1030, 1039. Included in that total was $30 million to the parents for non-economic damages stemming from their son's injuries and death. Id. at 1030. In affirming, the court stated that in the sixty years combined judicial experience of the judges on that appellate panel, "[t]hese injuries and the suffering they caused were extraordinary, among the worst that this panel has ever encountered." Id. at 1039.

The 2002 McGee decision by the Fourth District Court of Appeal must be read not only against the total facts and circumstances of that case, but also in light of the other Florida appellate court decisions of the same era. One year after the McGee decision the Fifth District Court of Appeal held that a $4.4 million award for non-economic damages to a seven-year-old for the death of his mother was "on the outer limit in size" of what is permissible. McQuillin, 840 So. 2d at 347. And five years after the McGee decision—just last year—the Third District Court of Appeal reversed an award of $8 million in non-economic damages to the parents ($4 million to each) of a child killed through medical malpractice on the ground that the amount was so large that it must have been the product of emotion and passion. Glabman, 954 So. 2d at 62. The McQuillan and Glabman decisions are more recent than the McGee decision and convince us that McGee is the outlier.

31

It is difficult to reconcile the Fourth District Court of Appeal's McGee

decision on the one hand, and the Third and Fifth District Court of Appeals'

Glabman and McQuillan decisions on the other. Given the lack of any fixed,

precise standards it may simply be that the point at which an award shocks the

judicial conscience varies from district court of appeal to district court of appeal in

Florida.[9] Our choice between them is guided by our duty, which we have already

noted, to decide this issue the way it would have been decided if the case had

arisen in the state courts and had been appealed there. The award would have

been reviewed by the Third District Court of Appeal. That court would not be

bound by the Fourth District's McGee decision, but would instead follow its own

decision last year in Glabman. For that reason, we will follow it too.

_____

[9] The Florida Supreme Court, of course, could resolve the differences between the district courts of appeal, but it has been more than thirty years since that Court's last decision on the subject. See Seaboard Coast Line R.R. Co. v. McKelvey, 270 So. 2d 705 (Fla. 1972). There is unlikely to ever be another one from it, because the Florida Legislature has resolved the matter.

In 2003 the legislature enacted a statute imposing a $1 million cap on "the total noneconomic damages recoverable from all practitioners, regardless of the number of claimants" in all medical malpractice cases resulting in a permanent vegetative state or death. Fla. Stat. § 766.118(2)(b). As a result of that statute, except possibly for one or two remaining pre-enactment, straggler cases, there will never be another non-economic damages award above $1 million in a case like this one.

The reform legislation does not apply to this case because the complaint was filed just days before the effective date of the act. Nevertheless, it is interesting to note that the people of Florida through their representatives have decided that the ceiling for non-economic damages in cases like this one ought to be $19 million less, or 95 percent lower, than was awarded to Bravo and Rodriguez.

32

For all of these reasons, we conclude that the record-setting award of non-economic damages in this FTCA case—$15 million to Bravo and $5 million to Rodriguez—is "so extravagant that it shocks the judicial conscience," <u>McQuillin</u>, 840 So. 2d at 347, and for that reason it is clear error which must be overturned.

**C.**

The government also contends that the award of $10 million in non-economic damages to Kevin himself is excessive, but in light of the abatement doctrine that is an issue we need not address. The parties agreed at oral argument that because Kevin died during the pendency of this appeal, if we vacated any part of the judgment and remanded for any reason, the judgment would no longer be "final" and the Florida abatement statute, Fla. Stat. § 768.20, would apply. We are vacating the portion of the judgment awarding non-economic damages to Bravo and Rodriguez, so the abatement statute does apply.

As a result, the medical malpractice personal injury action will abate and be replaced by a wrongful death action. Kevin's personal claims will not survive his death, and both the economic and non-economic damages awarded to him will have to be reevaluated accordingly. <u>See</u> <u>Variety Children's Hosp., Inc. v. Perkins</u>, 382 So. 2d 331, 336 & n.1 (Fla. 3d DCA 1980) (noting that had the court not affirmed the decision below and instead reversed on the merits, "the action would

33

again be 'pending' in the lower court and would, by operation of Sec. 768.20, then

be subject to abatement"); Levey, 909 So. 2d at 908 n.16 (noting that the effect of

the death of the plaintiff on the reversed final judgment "may be to 'abate' the

personal injury action entirely in favor of a yet-to-be brought action for [the

plaintiff's] wrongful death").  Likewise, Bravo's and Rodriguez's derivative loss

of consortium claims do not survive Kevin's death.  See ACandS, Inc. v. Redd,

703 So. 2d 492, 494 (Fla. 3d DCA 1997) (holding that a spouse's loss of

consortium claim is a derivative action that abates with the death of the injured

spouse).[10]

## D.

As for the district court's award of economic damages to Bravo, we have no

need to pass on the government's contention that the district court clearly erred in

calculating them.  Because the calculation was based on Kevin living twenty-one

---

[10] There appears to be a split among the district courts of appeal in Florida as to whether a loss of consortium action is derivative (abating with the injured party's death) or independent (surviving the injured party's death).  Compare Taylor v. Orlando Clinic, 555 So. 2d 876, 878 (Fla. 5th DCA 1989) (holding consortium claim survives husband's death), with ACandS, 703 So. 2d at 494 (holding consortium claim is derivative and, like the injured party's claim, abates with the injured party's death).  We are persuaded by the reasoning of the Third Circuit Court of Appeal in that the loss of consortium claim is derivative and abates.  ACandS, 703 So. 2d at 494. We again note that had this case been filed in state court in Miami, the law of the Florida Third Circuit Court of Appeal no doubt would have been applied.  See Farmer, 539 F.2d at 563.

34

years, it will have to be re-calculated on remand. Should the government's dissatisfaction about that measure of damages survive the remand it can file an appeal from the new judgment. Unless and until that happens, it would be premature for us to speak to any of the issues that may arise in a future appeal.

## IV.

The judgment entered against the government is **VACATED**, and the case is **REMANDED** to the district court for further proceedings consistent with this opinion.

WILSON, Circuit Judge, concurring in part, dissenting in part:

I concur with the majority on the liability issue and on apportionment of damages. However, I would not interfere with the district court's award of non-economic damages.

The standard of review governing a claim of excessive damages is well-established. Damage calculations are factual determinations committed to the sound discretion of the factfinder. Hence, we review the factfinder's award for clear error. *Ferrero v. United States*, 603 F.2d 510, 512 (5th Cir. 1979). Our role on appellate review is not to reassess the credibility of the witnesses or re-weigh the evidence. *See Williams v. United States*, 405 F.2d 234, 239 (5th Cir. 1968) ("We are not fact finders."). Furthermore, we are not authorized to substitute our judgment for that of the district court under the clear error standard of review. *Id.* ("Thus, while we might differ with the District Court regarding the amount of the award in this case, we cannot say that under the evidence it was 'clearly erroneous.'"). If there are two possible views of the evidence, the district court's preference for one of them cannot be clearly erroneous. "We [will] judge a trial court's finding to be clearly erroneous [only] when, after reviewing the entire evidence, we are 'left with the definite and firm conviction that a mistake has been committed.'" *Ferrero*, 603 F.2d at 512 (quoting *United States v. U.S. Gypsum*

*Co.*, 333 U.S. 364, 395, 68 S. Ct. 525, 542, 29 L. Ed. 746 (1948)).

Seldom are injuries identical, and there is no formula prescribed by law to calculate non-economic damages. Consequently, the amount awarded for pain and suffering will vary widely from case to case. Such damages "are largely speculative and difficult of determination, but no one's estimate is better than [the factfinder]'s." *Winner v. Sharp*, 43 So. 2d 634, 636 (Fla. 1950). The factfinder is simply required to award an amount it finds reasonable in light of the evidence.

Although the award of non-economic damages in this case is large, "a large damage award by itself is not indicative of an excessive or improper verdict." *Citrus County v. McQuillin*, 840 So. 2d 343, 347 (Fla. 5th DCA 2003). "If the jury's award is so extravagant that it shocks the judicial conscience, or is manifestly unsupported by the evidence or indicates the jury was influenced by passion, prejudice or other matters outside the record, the court in its discretion may set aside the verdict." *Id*. This FTCA case was not considered by a jury. Instead, this case was presented to the court during an eleven-day bench trial. Regardless, we apply the same standard to review the damage award. The majority is unable to point to any indication in the record that the United States District Judge who awarded the plaintiffs damages in this case was influenced by prejudice or passion. Nor is there any discussion in the majority opinion of any

37

mistake of fact, or evidence outside the record that influenced the judge as factfinder. Rather, by plowing a new and rather circuitous route, the majority concludes that the size of the verdict shocks the judicial conscience. To get there, the majority creates a new rule for Florida: Florida and federal courts are limited to considering only published appellate decisions when reviewing damage verdicts for excessiveness. More about that later.

The evidence in this case showed that Kevin Bravo was profoundly brain damaged as a result of his birth-related injuries. The delivering physician testified that the standard of care, given the clinical evidence of distress and danger, required Kevin to be delivered by 5:00 a.m. Even if the physician had called a cescerean section by 7:30 a.m., with delivery at 8:00 a.m., Kevin would have been normal. Yet, due to the negligence of multiple government actors, Kevin was not delivered until 1:20 p.m. This resulted in Kevin being born cyanotic, with no heart rate, respirations, muscle tone, or muscle reflex. It was only after 13 minutes of resuscitation that Kevin's heart finally began to beat, although he remained unable to breathe and without muscle tone or reflex.

At 29 months (his age at the time of trial), Kevin had the developmental stage of a 0–1 month old. He did not suck, swallow, eat, speak, see, hear, roll, sit, or respond to any stimuli except pain. When anyone moved Kevin's body, he

38

screamed in pain because his muscles were permanently contracted. Kevin's muscles were so rigid that his hip bones were pulled out of their sockets and his leg was broken during a therapy session. Kevin had to be tube fed every few hours and suctioned with a machine up to 20 times an hour to prevent him from choking on his own secretions. He had been hospitalized 20 times in two years. Experts testified that Kevin had a life expectancy of approximately 20 years and would require around-the-clock care for life, in addition to several surgeries and extensive therapy.

The record also contains evidence that Raiza Bravo suffered from major depression and anxiety as a consequence of the traumatic experience of Kevin's birth and resulting injuries. At trial, she described the extreme emotional pain she endured daily in tending to her son's needs while knowing he would never have a normal life. Her psychiatrist prescribed numerous medications to treat her depression, anxiety, and insomnia. Raiza testifed that she and her husband could not go out together alone because they could not leave Kevin, and they felt restricted from taking him to social places because of all the machines he required. Because of Kevin's needs, his parents no longer socialized with friends, which made them feel isolated. At trial, Kevin's father explained how, like his wife, his life completely revolved around Kevin. He testified that, while they had planned

to have at three or four children, Kevin's condition influenced their decision not to have other children until Kevin's health improved. They both testified that, because of the attention Kevin needed, they were no longer the young, romantic, and active couple they once were.

According to the district court:

> Kevin has been robbed of the life to which he was entitled, while his parents have been robbed of the son, and the relationship with their son, to which they were entitled. No one in the case disputed the magnitude of Kevin's injury, or the magnitude of the impact it has had on all of their lives. Everyone agreed Kevin's parents remain devoted to providing Kevin with the most loving and supportive environment possible, at great sacrifice to themselves. Florida law provides compensation for these losses.

The district court awarded $10 million to Kevin for "any bodily injury" and "any resulting pain and suffering, disability or physical impairment, disfigurement, mental anguish, inconvenience, and loss of capacity for the enjoyment of life, experienced in the past or to be experienced in the future." The court also found that Kevin's parents should be compensated "[f]or any loss . . . by reason of the injury to [their] son, Kevin, of his companionship, society, love, affection, and solace." Originally, the court awarded non-economic damages of $25 million to Kevin's mother and $15 million to Kevin's father. The court reduced these awards by $10 million each after the government filed its post-trial motion. This

40

resulted in a final non-economic damage award of $15 million to Kevin's mother

and $5 million to Kevin's father, for a total of $30 million (including the $10

million awarded to Kevin).

Although each case must be decided on its own facts and circumstances, we

generally consider the amounts awarded in prior cases for similar injuries to help

determine whether a damage award for pain and suffering is excessive. The

Florida Supreme Court has held:

> In cases where damages for mental pain and suffering are
> allowed, it must bear some reasonable relation to . . . the philosophy
> and general trend of decisions effecting such cases. When we say
> that the amount allowed must bear some reasonable relation to such
> factors, we do not mean that it must be equal to, be twice these, or
> bear any other arbitrary relation to them . . . .

*Fla. Dairies Co. v. Rogers*, 161 So. 85, 88 (Fla. 1935).

The majority opinion states that in determining the philosophy and general

trend of decisions effecting these cases in the State of Florida, we look *only* to

reported Florida appellate decisions. This misstatement of Florida law allows the

majority to ignore recent jury verdicts in factually similar cases awarding

comparable or higher damages for pain and suffering.

The majority opinion also disregards *McGee*[1] as an "outlier," which is a

---

[1] *Gen. Motors v. McGee*, 837 So. 2d 1010 (Fla. 4th DCA 2003).

41

2002 Florida District Court of Appeal case where a much larger non-economic award was upheld. The facts of that case closely mirror our own, and it ensures that the award in this case is not excessive.

I will compare the damage awards in *McGee* and the other factually similar cases to the award in this case, but first I will address the majority's new and unprecedented holding that we are limited to published appellate decisions by the Florida District Courts of Appeal when reviewing for excessiveness.

### *Johnson v. United States*

The majority relies heavily on our prior opinion in *Johnson v. United States*, 780 F.2d 902 (11th Cir. 1986), to support its holding that only prior published appellate opinions are relevant to determine whether a personal injury damage award in Florida is excessive. *Johnson* does not stand for this proposition. The case involved a $2 million dollar non-economic award to parents of a 21-month-old boy who died after consuming a large quantity of iron. There are no details about the child's injury. The *Johnson* court engaged in a discussion of damages to provide some helpful guidance to the district court on remand. *Id*. at 906 ("Although the case is remanded for further *evidentiary* proceedings and reconsideration of liability, it is appropriate for this Court to rule upon other issues raised for appeal for guidance to the district court on remand."). All the panel then

42

said about damages was that it was unable to locate a reported case approving a comparable award. *Id*. at 908. The court suggested that the plaintiffs compile "some research" on "similar cases tried in Florida" and submit them to the district court so that it could "be made part of the record to furnish a basis for the amount that should ultimately be awarded." *Id*. I find no language in the *Johnson* opinion limiting excessiveness review to published appellate decisions and excluding consideration of similar damage awards in comparable cases. In fact, the *Johnson* court actually said: "[F]lorida appellate courts rely heavily on the damages awarded by *juries* in similar cases." *Id*. (emphasis added.) It did not limit consideration to published Florida appellate decisions. The *Johnson* court had nothing to compare the award to, as we do in this case, thus, the court was without a way to assess and measure the award. *Johnson* also left open the possibility that the award in that case was reasonable.[2] The majority misconstrues *Johnson* to defend its flawed methodology, ignoring recent, factually similar cases with comparable non-economic damage awards. To accept the majority's logic is to conclude that if there was a factually identical case resulting in an unpublished

_____

[2]Unlike this case, medical malpractice liability in *Johnson* "was a close call, at best." *Johnson*, 780 F.2d at 908. In this case, medical negligence is clear. As the majority puts it in its opening paragraph, all that is at issue in this case is how much the government "must pay". As to the damage award in *Johnson* (a 22 year-old case), we do not know how much plaintiffs were awarded on remand. It could conceivably have been more.

opinion affirming the same damage award as in this one, we could not consider it.

### *Florida Courts Look Beyond Published Florida Appellate Decisions*

To my knowledge, no Florida state or federal court, before today, has held

that only published Florida appellate cases are relevant to the philosophy and

general trend analysis. The majority opinion creates this rule for the first time.

Before today, reviewing courts have always been able to consider comparable

verdict awards in similar cases without limitation to reported published decisions.

In *Loftin v. Wilson*, 67 So. 2d 185 (Fla. 1953), cited in *Johnson*, the Florida

Supreme Court relied on two Florida cases and five non-Florida cases, (i.e., two

unappealed New York trial court decisions, two Missouri Supreme Court

decisions, and an Ohio Supreme Court decision) as comparators in making an

excessiveness determination. *Id.* at 189-90. Additionally, the Florida Supreme

Court stated that it considered "many other" cases reviewed in a treatise, 16

A.L.R.2d 3. *Id.* at 190.[3]

---

[3]The majority opinion disregards *Loftin*, contending that: (1) a later Third DCA case, *Seaboard Coast Line R.R. Co. v. McKelvey*, 259 So. 2d 777 (Fla. 3d DCA 1972), adopted the rule that the comparative analysis is solely confined to published Florida appellate cases; and (2) the Florida Supreme Court affirmed *McKelvey* in *Seaboard Coast Line R.R. Co. v. McKelvey*, 270 So. 2d 705, 706 (Fla. 1972) ("*McKelvey II*"). This is incorrect for two reasons. First, while the court in *McKelvey* cited to published Florida appellate decisions as comparators, the court never held that the comparative analysis was confined to such cases. Indeed, the court actually made clear that it considered "a number of authorities throughout this country" when gauging the reasonableness of the award before it. *McKelvey*, 259 So. 2d at 780. If any inference is to be drawn from *McKelvey*, it is that the comparative analysis is not confined solely to published

Our own federal district courts in Florida are the same. In *Williams v.*

*United States*, 681 F.Supp. 763 (N.D. Fla. 1988), decided after we issued our

opinion in *Johnson*, the district court expressly considered "jury verdicts involving

the wrongful death of a minor child rendered in Escambia County, Florida," *id*. at

764, as well as cases from the Florida district courts of appeal, *id*. at 764-65.

In *Grayson v. United States*, 748 F.Supp. 854 (S.D. Fla. 1990), *aff'd in part,*

*vacated in part*, 953 F.2d 650 (11th Cir. 1992), the reviewing court considered

"nineteen wrongful death *verdicts and settlements* from courts in south Florida

that were submitted by plaintiff." *Id*. at 863 (emphasis added). We affirmed the

district court's judgment in *Grayson*, vacating only the award of interest from the

Florida decisions. Second, in *McKelvey II*, the Florida Supreme Court did not address the scope of the comparative analysis; it simply affirmed the Third DCA's holding that the award was reasonable. *McKelvey II*, 270 So. 2d at 706. *McKelvey II* certainly cannot be understood to overrule *Loftin*. Florida state courts cannot "decline to follow a supreme court opinion in the absence of a specific indication by the court itself that the case is no longer viable." *McGee v. State*, 570 So. 2d 1079, 1081 (Fla. 3d DCA 1990) (citing cases); *see also Puryear v. State*, 810 So. 2d 901, 905 (Fla. 2002) ("Where a court encounters an express holding from this Court on a specific issue and a subsequent contrary dicta statement on the same specific issue, the court is to apply our express holding in the former decision until such time as this Court recedes from the express holding."). Likewise, we may not turn to Florida's intermediate courts when the Florida Supreme Court has spoken on the issue—as it has in *Loftin*. *Freeman v. First Union Nat'l,* 329 F.3d 1231, 1232 (11th Cir. 2003). The majority opinion departs from our precedent in *Freeman* by failing to regard *Loftin* as binding and controlling Florida authority on this question.

The majority also cites to two other Third DCA cases. *See Metro. Dade County v. Dillon*, 305 So. 2d 36 (Fla. 3d DCA 1974); *Compania Dominicana de Aviacion v. Knapp*, 251 So. 2d 18 (Fla. 3d DCA 1971). Nowhere in either of these cases does the Third DCA hold that, as a rule, the comparative analysis is confined to published Florida appellate cases. Again, even assuming arguendo that they did, *Loftin* would still bind us.

date of initial judgment as opposed to the date of affirmance. *Grayson v. United States*, No. 90-6076 (11th Cir. Jan. 14, 1992) (unpublished).

In *Turner v. United States*, No. 3:03-CV-709-J-25TEM, 2005 WL 2077297 (M.D. Fla. Aug. 26, 2005), *rev'd in part on other grounds*, 514 F.3d 1194, the district court looked solely to two jury verdict reports in similar medical malpractice cases in finding that the damages were reasonable. *Id*. at *8.

In *Fairhurst v. United States*, No. 3:03CV601/RS, 2006 WL 2190553 (N.D. Fla. Aug. 1, 2006), the court considered three settlement awards as well as two trial verdicts in determining that the award was reasonable. *Id*. at *4.

Moreover, Florida's District Courts of Appeal ("DCAs") have historically looked outside the realm of its own appellate court system to measure excessiveness. In *Washington County Kennel Club, Inc. v. Edge*, 216 So. 2d 512 (Fla. 1st DCA 1968), *cert. dismissed*, 225 So. 2d 522 (Fla. 1969), Florida's First DCA considered appellate court decisions in Missouri and Georgia. In *City of Tamarac v. Garchar*, 398 So. 2d 889 (Fla. 4th DCA 1981), *overruled in part on other grounds by Seaboard Coastline R.R. v. Addison*, 502 So. 2d 1241, 1242-43 (Fla. 1987), Florida's Fourth DCA looked beyond Florida decisions to the District of Columbia U.S. Court of Appeals, as well as two California appellate state cases and one Nevada appellate state case when conducting an excessiveness

determination. *Id*. at 896 n.7.

More recently, Florida's Fourth DCA discussed the trial court's use of the *Williams* analysis in *Hyundai Motor Co. v. Ferayorni*, 842 So. 2d 905, 908 (Fla. 4th DCA 2003). While the court distinguished *Williams* because it "was decided in 1988 and relied on verdicts returned between 1974 and 1987," *id*. at 909, it did not in any way suggest that the *Williams* approach was improper or that a trial court could not consider unappealed jury verdicts when testing a damage award for excessiveness. The court simply concluded that the original jury verdict should stand because the trial court's remittitur was based on stale information. *Id*. ("The *Williams* opinion recognized that cases decided more than five years earlier were of limited value.").

That same year, Florida's Fifth DCA looked to an unpublished and unappealed Delaware trial court, an unpublished Texas appellate court, a Texas appellate court, a Missouri appellate court, and a Florida federal district court in identifying a trend in damage awards for loss of a child, parent, or spouse. *McQuillin*, 840 So. 2d at 347-48. Likewise, in 2004, the Third DCA considered a federal New York district court case in determining that the award was excessive. *Sta-Rite Indus., Inc. v. Levey*, 909 So. 2d 901 (Fla. 3d DCA 2004), *cert. denied*,

47

919 So. 2d 435 (Fla. 2005).[4]

Therefore, it is clear that even the Florida DCAs do not restrict their review

of damage awards to comparisons of published decisions from the state's appellate

courts.  No court in Florida has heretofore limited the comparative analysis to

---

[4]The majority states that *Levey* cited *Slade v. Whitco Corp.*, 811 F. Supp. 71 (N.D.N.Y. 1993) and other cases not to compare awards in those cases, but for the proposition that a damages award "not based upon sufficient credible evidence" cannot be sustained. The relevant passage from *Levey* is as follows:

> In the light of the equivocal and uncertain testimony that Lorenzo would enjoy a normal life expectancy of more than forty years, and the almost entirely speculative testimony that, despite his vegetative state, he actually suffered excruciating "conscious" pain and suffering for all that period, the amount of the verdict is shockingly excessive, *see Brown v. Stuckey*, 749 So. 2d 490 (Fla. 1999); *MBL Life Assurance Corp v. Suarez*, 768 So. 2d 1129 (Fla. 3d DCA 2000); *Jeep Corp. v. Walker*, 528 So. 2d 1203 (Fla. 4th DCA 1988); *Slade v. Whitco Corp.*, 811 F.Supp. 71 (N.D.N.Y. 1993), *aff'd*, 999 F.2d 537 (2d Cir. 1993), and as such, and as we find, contrary to the manifest weight of the evidence. *Miller v. First American Bank and Trust*, 607 So. 2d 483 (Fla. 4th DCA 1992); *Florida Nat'l Bank v. Sherouse*, 80 Fla. 405, 86 So. 279 (Fla. 1920); *Ziontz v. Ocean Trail Unit Owners Ass'n, Inc.*, 663 So. 2d 1334 (Fla. 4th DCA 1993); *In re: Estate of Simon*, 402 So. 2d 26 (Fla. 3d DCA 1981).

*Levey*, 909 So. 2d at 909.

Left unaddressed by the majority opinion is that the first string cite in *Sta-Rite* includes *Walker*, which contains no discussion of a damages award "not based upon sufficient credible evidence;" indeed, the court approved the jury's pain and suffering verdict. *Walker*, 528 So. 2d at 1205.  Moreover, it is doubtful that the first string cite aims at awards being stricken for insufficient credible evidence when that proposition is so closely related to the second string cite aimed at awards that are "contrary to the manifest weight of the evidence."  The better reading is that *Suarez* (striking $4 million award for pain and suffering to four adult children as a result of father's death in boat accident), *Brown* (striking $50,000 award for pain and suffering in defamation case), *Walker* (upholding $4.9 million award for pain and suffering to quadriplegic victim in vehicle accident case), and *Slade* (upholding $6 million pain and suffering award to brain-damaged and quadriplegic victim of vehicle accident) are all cited to show that the $104,409,053.20 award to the severely brain-damaged victim of a swimming pool accident was "shockingly excessive."  *Levey*, 909 So. 2d at 909.

published Florida appellate decisions.

## *Glabman, McQuillin and McGee*

Our role is to review the size of the non-economic damage award to ensure that it does not exceed the maximum limit of the reasonable range set by awards in similar Florida cases. The question of excessiveness is not the kind of question that should subject itself to irreconcilable splits between courts, thus requiring us to choose one over the other, which is what the majority opinion does with *Glabman*, *McQuillin* and *McGee*. Instead, we review the award to determine whether it is "so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate." *Bould v. Touchette*, 349 So. 2d 1181, 1184-85 (Fla. 1977).

*Glabman* was about a teenage girl who died from Lupus complications. *Glabman v. De La Cruz*, 954 So. 2d 60, 62 (Fla. 3d DCA 2007). The jury found the girl's physician to be 80 percent negligent and awarded the parents $8 million dollars. *Id*. at 61-62. On review, the Third DCA recognized that the father's trial testimony was "highly emotional" and caused the father, the court personnel, and the trial judge to cry. *Id*. at 62. In fact, the jury returned a verdict for $2 million dollars more than what the parent's counsel had requested. *Id*. at 62. Consequently, the Third DCA found that the award was "so excessive" that it

49

"could only have been a product of passionate emotion based on [the father's] emotional testimony." *Id*. at 63. These facts are dramatically different than our own. The government points to no highly emotional evidence – let alone any evidence that caused court personnel or the United States District Judge who heard this case to cry. The judge here did not award an amount in excess of what was requested by the plaintiffs. And liability was not a close question – the government concedes that plaintiff's injuries were due to medical negligence.

*McQuillin* involved a woman who died in a car accident – an accident for which she was found to be 80 percent negligent, while the defendant was found only 20 percent negligent. *Citrus County v. McQuillin*, 840 So. 2d 343 344-45 (Fla. 5th DCA 2003). The jury awarded the woman's son $4.4 million for pain and suffering. *Id*. at 347. After commenting that the award was "on the outer limit in size," the Fifth DCA held that the amount determination was not for it to decide, but for the jury:

> Who can place a dollar value on a human life, measured by the loss and grief of a loved one? That difficult question is generally one for the jury or factfinder, not the appellate court.

*Id*. at 348.

The Fifth DCA in *McQuillin* approved the jury verdict.

*McGee* involved a family of four, all of whom were burned because of a

50

design defect in their car's gas tank. *Gen. Motors Corp. v. McGee*, 837 So. 2d 1010, 1015-16 (Fla. 4th DCA 2002). While the parents and daughter survived, the son died shortly after the accident from severe burns covering 98 percent of his body. *Id*. at 1016. Like this case, the *McGee* parents endured extraordinary pain and suffering in watching their son suffer without being able to assist him. *Id*. at 1015-16, 1039. The parents were awarded $30 million dollars for their pain and suffering. *Id*. at 1030. On review, the Fourth DCA found that the verdict "was not 'so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate.'" *Id*. at 1039 (quoting *Bould*, 349 So. 2d at 1184). The $30 million dollar non-economic award in *McGee* was for the parents alone. *Id*. at 1030. In this case, Kevin Bravo's parents received somewhat less ($20 million). When you combine Kevin's non-economic award with his parents, the total award still does not exceed the non-economic damages approved by the Fourth DCA in *McGee*.

To dismiss *McGee* as an outlier or an annoyance, is, in my view to usurp the applicable Florida law. I can find no precedent in Florida to support an excessive determination made by lining up awards in similar cases, cutting off the top award, and treating the lower awards as a ceiling to the amount that can be awarded.

I am also unaware of any Florida DCA case suggesting that the DCAs are

51

split on the question of excessiveness. Yet, because the majority perceives a DCA-split on this question, the majority says it has a duty to follow the Third DCA decision in *Glabman*—rather than the Fourth DCA decision in *McGee*. According to the majority, the Third DCA trumps because it would have had jurisdiction over this case had it been filed in the state system. This sets an interesting precedent. Since the majority holds that the DCAs are split on what constitutes an excessive verdict, Eleventh Circuit courts applying Florida law to excessiveness determinations will systematically consider case law from the jurisdictionally-relevant DCA as controlling. Rather than applying Florida law, our courts will routinely apply a jurisdictional subset of Florida law. I do not know of any Florida DCA that, as a rule, makes excessiveness determinations by confining itself solely to its own DCA precedent.[5] But, ironically, we will be doing just that, and we will say we are following Florida law in doing so. If there was ever an incentive for forum shopping, this is it—and the shopping only works in federal courts of the Eleventh Circuit.

---

[5]Indeed, one of the very Third DCA cases relied upon by the majority looks to the excessiveness determinations made in other non-Third DCA decisions. *See Compania Dominicana de Aviacion v. Knapp*, 251 So. 2d 18, 23 (Fla. 3d DCA 1971) (evaluating the excessiveness determinations made in two First DCA cases).

## *Similar Awards in Recent Cases*

In addition to *McGee*, there are other similar cases that show Bravo's award to be non-excessive. Bravo has called our attention to three judgments entered after jury verdicts in comparable cases within the last three years that included non-economic damages exceeding the damages finally awarded by the district court in this case. *Korzeniowski v. Eagleman*, No. CL 00-4828 AO (Fla. Cir. Ct. 2004), a medical negligence case arising in Palm Beach County involving a child who was born with a comparably devastating brain injury, resulted in a $31 million non-economic damage award—$17 million for the child's past and future pain and suffering, $7 million for the mother's loss of filial consortium, and $7 million for the father's loss of filial consortium. *Hinton v. 2331 Adams Street Corp.*, No. 01-012933(12) (Fla. Cir. Ct. 2003), a similar case from Broward County, involved a two-year-old child who suffered severe brain damage and resulted in a $45 million combined non-economic damage award—$35 million for the child's past and future pain and suffering, $5 million for the mother's loss of filial consortium, and $5 million for the father's loss of filial consortium. Again, in *Navarro v. Austin*, No. 02-6154 (Fla. Cir. Ct. 2006), a trial court in Hillsborough County entered judgment on a jury verdict awarding over $100 million in damages, $46.5 million of which was for the injured plaintiff's past and

future pain and suffering and $52.5 million of which was for the wife's past and future loss of her husband's services, comfort, society, and affection. These trial court judgments in comparable cases demonstrate that the damage award in this case was not "so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the [trier of fact] may properly operate," the only instance in which an appellate court should disturb a verdict for damages. *Bould*, 349 So. 2d at 1184-85 ("In tort cases[,] damages are to be measured by the [factfinder's] discretion. The court should never declare a verdict excessive merely because it is above the amount which the court itself considers the [trier of fact] should have allowed.").

Florida puts the burden on the appellant to demonstrate clear error by coming forward with factually similar cases demonstrating that a damage award exceeds the maximum limit of a reasonable range. It has long been the rule in Florida that "[t]he burden is on an appellant to demonstrate that the jury rendered an excessive [verdict]." *Seaboard Coastline R.R. Co. v. McKelvey*, 259 So. 2d 777, 781 (Fla. 3d DCA 1972). The government failed to make its case, and we should not make it for them, creating Florida law in the process.

### *Other FTCA Awards*

There have been other FTCA awards with higher non-economic damages. *See Gutierrez v. United States*, 2007 WL 2827720 (C.D. Cal. 2007) (total award of $55,184.288, of which $31,750,000.00 was non-economic damages to child and mother in a car accident case brought under the FTCA). There have also been FTCA awards with higher total amounts. *See Dickerson v. United States*, 280 F.3d 470 (5th Cir. 2002) (total award of $44,717,681.00 to parents and child where medical negligence during birth delivery resulted in profound brain and neurological injuries to the child). The verdict in *Dickerson* was ultimately reduced on appeal, not because it was excessive, but because the plaintiffs were precluded from recovering more than the $20 million dollars they requested in their administrative claim. *Id*. at 479.

### *Conclusion*

By holding that we may only look to published appellate decisions when testing a damage award for excessiveness, the majority re-writes Florida law. We do not have the authority to make Florida law. That is the task of the Florida courts and the Florida legislature, and we should leave that task to them.[6]

---

[6]The Florida legislature, in 2003, capped non-economic damages at $1 million in cases of catastrophic injury. *See* Fla. Stat. § 766.118(2)(b). The fact that the Florida legislature capped non-economic damages does not establish a downward trend for awards in cases like this one; it

I find no clear error on the part of the United States District Judge, who heard and considered the evidence and awarded the plaintiffs their damages after an eleven-day bench trial. The majority opinion fails to make the case that the verdict is unsupported by the evidence, that it is based on anything outside of the record, or that it reflects passion or prejudice by the judge. Nor does the verdict "shock the judicial conscience" when compared with other verdicts in similar cases, some of which are higher and some of which are lower. Remanding this case back to the district court for a lower damages award constitutes an improper invasion into the realm of factfinding. Therefore, I would affirm.

---

suggests the contrary. The passage of the non-economic damages cap is an indication that, in the view of the Florida legislature, jury awards in Florida were becoming *too high*. The legislature explicitly decided that the act does not apply to cases such as this one, which was commenced before September 15, 2003, the effective date of the act.